ADICKES *v.* S. H. KRESS & CO.

No. 79.   Argued November 12, 1969—Decided June 1, 1970

*Eleanor Jackson Piel* argued the cause for petitioner. With her on the briefs was *Melvin L. Wulf.*

*Sanford M. Litvack* argued the cause for respondent. With him on the briefs were *James R. Withrow, Jr.,* and *Alfred H. Hoddinott, Jr.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

Petitioner, Sandra Adickes, a white school teacher from New York, brought this suit in the United States District Court for the Southern District of New York against respondent S. H. Kress & Co. ("Kress") to recover damages under 42 U. S. C. § 1983 [1] for an alleged violation of her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment. The suit arises out of Kress' refusal to serve lunch to Miss Adickes at its restaurant facilities in its Hattiesburg, Mississippi, store on August 14, 1964, and Miss Adickes' subsequent arrest upon her departure from the store by the Hattiesburg police on a charge of vagrancy. At the time of both the refusal to serve and the arrest, Miss Adickes was with six young people, all Negroes, who were her students in a Mississippi "Freedom School" where she was

---

[1] Rev. Stat. § 1979, 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

teaching that summer. Unlike Miss Adickes, the students were offered service, and were not arrested.

Petitioner's complaint had two counts,[2] each bottomed on § 1983, and each alleging that Kress had deprived her of the right under the Equal Protection Clause of the Fourteenth Amendment not to be discriminated against on the basis of race. The first count charged that Miss Adickes had been refused service by Kress because she was a "Caucasian in the company of Negroes." Petitioner sought, *inter alia,* to prove that the refusal to serve her was pursuant to a "custom of the community to segregate the races in public eating places." However, in a pretrial decision, 252 F. Supp. 140 (1966), the District Court ruled that to recover under this count, Miss Adickes would have to prove that at the time she was refused service, there was a specific "custom . . . of refusing service to whites in the company of Negroes" and that this custom was "enforced by the State" under Mississippi's criminal trespass statute.[3] Because petitioner was unable to prove at the trial that there were other instances in Hattiesburg of a white person having been refused service while in the company of Negroes,

---

[2] The District Court denied petitioner's request to amend her complaint to include a third count seeking liquidated damages under §§ 1 and 2 of the Civil Rights Act of 1875, 18 Stat. 335. Although in her certiorari petition, petitioner challenged this ruling, and asked this Court to revive this statute by overruling the holding in the *Civil Rights Cases,* 109 U. S. 3 (1883), examination of the record shows that petitioner never raised any issue concerning the 1875 statute before the Court of Appeals. Accordingly, the Second Circuit did not rule on these contentions. Where issues are neither raised before nor considered by the Court of Appeals, this Court will not ordinarily consider them. *Lawn* v. *United States,* 355 U. S. 339, 362–363, n. 16 (1958); *Husty* v. *United States,* 282 U. S. 694, 701–702 (1931); *Duignan* v. *United States,* 274 U. S. 195, 200 (1927). We decline to do so here.

[3] The statute, Miss. Code Ann. § 2046.5 (1956), *inter alia,* gives the owners, managers, or employees of business establishments the right to choose customers by refusing service.

the District Court directed a verdict in favor of respondent. A divided panel of the Court of Appeals affirmed on this ground, also holding that § 1983 "requires that the discriminatory custom or usage be proved to exist in the locale where the discrimination took place, and in the State generally," and that petitioner's "proof on both points was deficient," 409 F. 2d 121, 124 (1968).

The second count of her complaint, alleging that both the refusal of service and her subsequent arrest were the product of a conspiracy between Kress and the Hattiesburg police, was dismissed before trial on a motion for summary judgment. The District Court ruled that petitioner had "failed to allege any facts from which a conspiracy might be inferred." 252 F. Supp., at 144. This determination was unanimously affirmed by the Court of Appeals, 409 F. 2d, at 126–127.

Miss Adickes, in seeking review here, claims that the District Court erred both in directing a verdict on the substantive count, and in granting summary judgment on the conspiracy count. Last Term we granted certiorari, 394 U. S. 1011 (1969), and we now reverse and remand for further proceedings on each of the two counts.

As explained in Part I, because the respondent failed to show the absence of any disputed material fact, we think the District Court erred in granting summary judgment. With respect to the substantive count, for reasons explained in Part II, we think petitioner will have made out a claim under § 1983 for violation of her equal protection rights if she proves that she was refused service by Kress because of a state-enforced custom requiring racial segregation in Hattiesburg restaurants. We think the courts below erred (1) in assuming that the only proof relevant to showing that a custom was state-enforced related to the Mississippi criminal trespass statute; (2) in defining the relevant

state-enforced custom as requiring proof of a practice both in Hattiesburg and throughout Mississippi, of refusing to serve white persons in the company of Negroes rather than simply proof of state-enforced segregation of the races in Hattiesburg restaurants.

## I

Briefly stated, the conspiracy count of petitioner's complaint made the following allegations: While serving as a volunteer teacher at a "Freedom School" for Negro children in Hattiesburg, Mississippi, petitioner went with six of her students to the Hattiesburg Public Library at about noon on August 14, 1964. The librarian refused to allow the Negro students to use the library, and asked them to leave. Because they did not leave, the librarian called the Hattiesburg chief of police who told petitioner and her students that the library was closed, and ordered them to leave. From the library, petitioner and the students proceeded to respondent's store where they wished to eat lunch. According to the complaint, after the group sat down to eat, a policeman came into the store "and observed [Miss Adickes] in the company of the Negro students." A waitress then came to the booth where petitioner was sitting, took the orders of the Negro students, but refused to serve petitioner because she was a white person "in the company of Negroes." The complaint goes on to allege that after this refusal of service, petitioner and her students left the Kress store. When the group reached the sidewalk outside the store, "the Officer of the Law who had previously entered [the] store" arrested petitioner on a groundless charge of vagrancy and took her into custody.

On the basis of these underlying facts petitioner alleged that Kress and the Hattiesburg police had conspired (1) "to deprive [her] of her right to enjoy equal treatment and service in a place of public accommoda-

tion"; and (2) to cause her arrest "on the false charge of vagrancy."

## A. Conspiracies Between Public Officials and Private Persons—Governing Principles

The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the "Constitution and laws" of the United States. Second, the plaintiff must show that the defendant deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." This second element requires that the plaintiff show that the defendant acted "under color of law." [4]

As noted earlier we read both counts of petitioner's complaint to allege discrimination based on race in violation of petitioner's equal protection rights.[5] Few prin-

---

[4] See, e. g., Monroe v. Pape, 365 U. S. 167, 184, 187 (1961); United States v. Price, 383 U. S. 787, 793, 794 (1966).

[5] The first count of petitioner's complaint alleges that Kress' refusal to serve petitioner "deprived [her] of the privilege of equal enjoyment of a place of public accommodation by reason of her association with Negroes and [she] was *thereby discriminated against because of race in violation of the Constitution* of the United States and of Title 42 United States Code, Section 1983." (App. 4.) (Emphasis added.) The conspiracy count alleges, *inter alia*, that Kress and the Hattiesburg police "conspired together to deprive plaintiff of her right to enjoy equal treatment and service in a place of public accommodation."

The language of the complaint might, if read generously, support the contention that petitioner was alleging a violation of Title II, the Public Accommodations provisions, of the 1964 Civil Rights Act, 78 Stat. 243, 42 U. S. C. § 2000a. It is clear, and respondent seemingly concedes, that its refusal to serve petitioner was a violation of § 201 of the 1964 Act, 42 U. S. C. § 2000a. It is very doubtful, however, that Kress' violation of Miss Adickes' rights under the Public Accommodations Title could properly serve as a basis for recovery under § 1983. Congress deliberately provided no damages

ciples of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race

remedy in the Public Accommodations Act itself, and § 207 (b) provides that the injunction remedy of § 206 was the "exclusive means of enforcing the rights based on this title." Moreover, the legislative history makes quite plain that Congress did not intend that violations of the Public Accommodations Title be enforced through the damages provisions of § 1983. See 110 Cong. Rec. 9767 (remark of floor manager that the language of 207 (b) "is necessary because otherwise it . . . would result . . . in civil liability for damages under 42 U. S. C. § 1983"); see also 110 Cong. Rec. 7384, 7405.

In *United States* v. *Johnson,* 390 U. S. 563 (1968), the Court held that violations of § 203 (b) of the Public Accommodations Title could serve as the basis for criminal prosecution under 18 U. S. C. § 241 (another civil rights statute) against "outsiders," having no relation to owners and proprietors of places of public accommodations, notwithstanding the "exclusive" remedy provision of § 207 (b). It is doubtful whether the *Johnson* reasoning would allow recovery under § 1983 for Kress' alleged violation of § 201, and indeed the petitioner does not otherwise contend. The Court, in *Johnson,* in holding that the § 207 (b) limitation did not apply to violations of § 203, stated: "[T]he exclusive-remedy provision of § 207 (b) was inserted *only to make clear that the substantive rights to public accommodation defined in § 201 and § 202 are to be enforced exclusively by injunction.*" 390 U. S., at 567.

In any event, we think it clear that there can be recovery under § 1983 for conduct that violates the Fourteenth Amendment, even though the same conduct might also violate the Public Accommodations Title which itself neither provides a damages remedy nor can be the basis of a § 1983 action. Section 207 (b) of the Public Accommodations Title expressly provides that nothing in that title "shall preclude any individual . . . from asserting any right based on any other Federal or State law not inconsistent with this title . . . or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right." Therefore, quite apart from whether § 207 precludes enforcement of one's rights under the Public Accommodations Title through a damages action under 42 U. S. C. § 1983, we think it evident that enforcement of one's constitutional rights under § 1983 is not "inconsistent" with the Public Accommodations Act.

or the race of his companions, or in any way act to compel or encourage racial segregation.[6] Although this is a lawsuit against a private party, not the State or one of its officials, our cases make clear that petitioner will have made out a violation of her Fourteenth Amendment rights and will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow reached an understanding to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest because she was a white person in the company of Negroes.

The involvement of a state official in such a conspiracy plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, whether or not the actions of the police were officially authorized, or lawful; *Monroe* v. *Pape,* 365 U. S. 167 (1961); see *United States* v. *Classic,* 313 U. S. 299, 326 (1941); *Screws* v. *United States,* 325 U. S. 91, 107–111 (1945); *Williams* v. *United States,* 341 U. S. 97, 99–100 (1951). Moreover, a private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute. To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents," *United States* v. *Price,* 383 U. S. 787, 794 (1966).[7]

---

[6] *E. g., Brown* v. *Board of Education,* 347 U. S. 483 (1954); cf. *Barrows* v. *Jackson,* 346 U. S. 249 (1953).

[7] Although *Price* concerned a criminal prosecution involving 18 U. S. C. § 242, we have previously held that "under color of law" means the same thing for § 1983. *Monroe* v. *Pape, supra,* at 185 (majority opinion), 212 (opinion of Frankfurter, J.); *United States* v. *Price, supra,* at 794 n. 7.

## B. Summary Judgment

We now proceed to consider whether the District Court erred in granting summary judgment on the conspiracy count. In granting respondent's motion, the District Court simply stated that there was "no evidence in the complaint or in the affidavits and other papers from which a 'reasonably-minded person' might draw an inference of conspiracy," 252 F. Supp., at 144, aff'd, 409 F. 2d, at 126–127. Our own scrutiny of the factual allegations of petitioner's complaint, as well as the material found in the affidavits and depositions presented by Kress to the District Court, however, convinces us that summary judgment was improper here, for we think respondent failed to carry its burden of showing the absence of any genuine issue of fact. Before explaining why this is so, it is useful to state the factual arguments, made by the parties concerning summary judgment, and the reasoning of the courts below.

In moving for summary judgment, Kress argued that "uncontested facts" established that no conspiracy existed between any Kress employee and the police. To support this assertion, Kress pointed first to the statements in the deposition of the store manager (Mr. Powell) that (a) he had not communicated with the police,[8] and that (b) he had, by a prearranged tacit

_____

[8] In his deposition, Powell admitted knowing Hugh Herring, chief of police of Hattiesburg, and said that he had seen and talked to him on two occasions in 1964 prior to the incident with Miss Adickes. (App. 123–126.) When asked how often the arresting officer, Ralph Hillman, came into the store, Powell stated that he didn't know precisely but "Maybe every day." However, Powell said that on August 14 he didn't recall seeing any policemen either inside or outside the store (App. 136), and he denied (1) that he had called the police, (2) that he had agreed with any public official to deny Miss Adickes the use of the library, (3) that he had agreed with any public official to refuse Miss Adickes service in the Kress store on the day in ques-

signal,[9] ordered the food counter supervisor to see that Miss Adickes was refused service only because he was fearful of a riot in the store by customers angered at seeing a "mixed group" of whites and blacks eating together.[10] Kress also relied on affidavits from the Hatties-

tion, or (4) that he had asked any public official to have Miss Adickes arrested. App. 154–155.

[9] The signal, according to Powell, was a nod of his head. Powell claimed that at a meeting about a month earlier with Miss Baggett, the food counter supervisor, he "told her not to serve the white person in the group if I . . . shook my head no, But, if I didn't give her any sign, to go ahead and serve anybody." App. 135.

Powell stated that he had prearranged this tacit signal with Miss Baggett because "there was quite a lot of violence . . . in Hattiesburg" directed towards whites "with colored people, in what you call a mixed group." App. 131.

[10] Powell described the circumstances of his refusal as follows:

"On this particular day, just shortly after 12 o'clock, I estimate there was 75 to 100 people in the store, and the lunch counter was pretty—was pretty well to capacity there, full, and I was going up towards the front of the store in one of the aisles, and looking towards the front of the store, and there was a group of colored girls, and a white woman who came into the north door, which was next to the lunch counter.

"And the one thing that really stopped me and called my attention to this group, was the fact that they were dressed alike. They all had on, what looked like a light blue denim skirt. And the best I can remember is that they were—they were almost identical, all of them. And they came into the door, and people coming in stopped to look, and they went on to the booths. And there happened to be two empty there. And one group of them and the white woman sat down in one, and the rest of them sat in the second group.

"And, almost immediately there—I mean this, it didn't take just a few seconds from the time they came into the door to sit down, but, already the people began to mill around the store and started coming over towards the lunch counter. And, by that time I was up close to the candy counter, and I had a wide open view there. And the people had real sour looks on their faces, nobody was joking, or being corny, or carrying on. They looked like a frightened mob. They really did. I have seen mobs before. I was

burg chief of police,[11] and the two arresting officers,[12] to the effect that store manager Powell had not requested that petitioner be arrested. Finally, Kress pointed to the statements in petitioner's own deposition that she had no knowledge of any communication between any Kress employee and any member of the Hattiesburg police, and was relying on circumstantial evidence to support her

in Korea during the riots in 1954 and 1955. And I know what they are. And this actually got me.

"I looked out towards the front, and we have what they call see-through windows. There is no backs to them. You can look out of the store right into the street. And the north window, it looks right into the lunch counter. 25 or 30 people were standing there looking in, and across the street even, in a jewelry store, people were standing there, and it looked really bad to me. It looked like one person could have yelled 'Let's get them,' which has happened before, and cause this group to turn into a mob. And, so, quickly I just made up my mind to avoid the riot, and protect the people that were in the store, and my employees, as far as the people in the mob who were going to get hurt themselves. I just knew that something was going to break loose there." App. 133–134.

[11] The affidavit of the chief of police, who it appears was not present at the arrest, states in relevant part:

"Mr. Powell had made no request of me to arrest Miss Sandra Adickes or any other person, in fact, I did not know Mr. Powell personally until the day of this statement. [But cf. Powell's statement at his deposition, n. 8, *supra*.] Mr. Powell and I had not discussed the arrest of this person until the day of this statement and we had never previously discussed her in any way." (App. 107.)

[12] The affidavits of Sergeant Boone and Officer Hillman each state, in identical language:

"I was contacted on this date by Mr. John H. Williams, Jr., a representative of Genesco, owners of S. H. Kress and Company, who requested that I make a statement concerning alleged conspiracy in connection with the aforesaid arrest.

"This arrest was made on the public streets of Hattiesburg, Mississippi, and was an officers discretion arrest. I had not consulted with Mr. G. T. Powell, Manager of S. H. Kress and Company in Hattiesburg, and did not know his name until this date. No one at the Kress store asked that the arrest be made and I did not consult with anyone prior to the arrest." (App. 110, 112.)

contention that there was an arrangement between Kress and the police.

Petitioner, in opposing summary judgment, pointed out that respondent had failed in its moving papers to dispute the allegation in petitioner's complaint, a statement at her deposition,[13] and an unsworn statement by a Kress employee,[14] all to the effect that there was a policeman in the store at the time of the refusal to serve her, and that this was the policeman who subsequently

---

[13] When asked whether she saw any policeman in the store up to the time of the refusal of service, Miss Adickes answered: "My back was to the door, but one of my students saw a policeman come in." (App. 75.) She went on to identify the student as "Carolyn." At the trial, Carolyn Moncure, one of the students who was with petitioner, testified that "about five minutes" after the group had sat down and while they were still waiting for service, she saw a policeman come in the store. She stated: "[H]e came in the store, my face was facing the front of the store, and he came in the store and he passed, and he stopped right at the end of our booth, and he stood up and he looked around and he smiled, and he went to the back of the store, he came right back and he left out." (App. 302.) This testimony was corroborated by that of Dianne Moncure, Carolyn's sister, who was also part of the group. She testified that while the group was waiting for service, a policeman entered the store, stood "for awhile" looking at the group, and then "walked to the back of the store." (App. 291.)

[14] During discovery, respondent gave to petitioner an unsworn statement by Miss Irene Sullivan, a check-out girl. In this statement Miss Sullivan said that she had seen Patrolman Hillman come into the store "[s]hortly after 12:00 noon," while petitioner's group was in the store. She said that he had traded a "hello greeting" with her, and then walked past her check-out counter toward the back of the store "out of [her] line of vision." She went on: "A few minutes later Patrolman Hillman left our store by the northerly front door just slightly ahead of a group composed of several Negroes accompanied by a white woman. As Hillman stepped onto the sidewalk outside our store the police car pulled across the street and into an alley that is alongside our store. The police car stopped and Patrolman Hillman escorted the white woman away from the Negroes and into the police car." (App. 178.)

arrested her. Petitioner argued that although she had no knowledge of an agreement between Kress and the police, the sequence of events created a substantial enough possibility of a conspiracy to allow her to proceed to trial, especially given the fact that the noncircumstantial evidence of the conspiracy could only come from adverse witnesses. Further, she submitted an affidavit specifically disputing the manager's assertion that the situation in the store at the time of the refusal was "explosive," thus creating an issue of fact as to what his motives might have been in ordering the refusal of service.

We think that on the basis of this record, it was error to grant summary judgment. As the moving party, respondent had the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party.[15] Respondent here did not carry its burden because of its failure to foreclose the possibility that there was a policeman in the Kress store while petitioner was awaiting service, and that this policeman reached an understanding with some Kress employee that petitioner not be served.

It is true that Mr. Powell, the store manager, claimed in his deposition that he had not seen or communicated with a policeman prior to his tacit signal to Miss Baggett, the supervisor of the food counter. But respondent did not submit any affidavits from Miss Baggett,[16] or from

---

[15] See, e. g., United States v. Diebold, Inc., 369 U. S. 654, 655 (1962); 6 J. Moore, Federal Practice ¶ 56.15[3] (2d ed. 1966).

[16] In a supplemental brief filed in this Court respondent lodged a copy of an unsworn statement by Miss Baggett denying any contact with the police on the day in question. Apart from the fact that the statement is unsworn, see Fed. Rule Civ. Proc. 56 (e), the statement itself is not in the record of the proceedings below and therefore could not have been considered by the trial court. Mani-

158

Miss Freeman,[17] the waitress who actually refused petitioner service, either of whom might well have seen and communicated with a policeman in the store. Further, we find it particularly noteworthy that the two officers involved in the arrest each failed in his affidavit to foreclose the possibility (1) that he was in the store while petitioner was there; and (2) that, upon seeing petitioner with Negroes, he communicated his disapproval to a Kress employee, thereby influencing the decision not to serve petitioner.

Given these unexplained gaps in the materials submitted by respondent, we conclude that respondent failed to fulfill its initial burden of demonstrating what is a critical element in this aspect of the case—that there was no policeman in the store. If a policeman were present, we think it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a "meeting of the minds" and thus reached an understanding that petitioner should be refused service. Because "[o]n summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light

festly, it cannot be properly considered by us in the disposition of the case.

During discovery, petitioner attempted to depose Miss Baggett. However, Kress successfully resisted this by convincing the District Court that Miss Baggett was not a "managing agent," and "was without power to make managerial decisions."

[17] The record does contain an unsworn statement by Miss Freeman in which she states that she "did not contact the police or ask anyone else to contact the police *to make the arrest which subsequently occurred.*" (App. 177.) (Emphasis added.) This statement, being unsworn, does not meet the requirements of Fed. Rule Civ. Proc. 56 (e), and was not relied on by respondent in moving for summary judgment. Moreover, it does not foreclose the possibility that Miss Freeman was influenced in her refusal to serve Miss Adickes by some contact with a policeman present in the store.

most favorable to the party opposing the motion," *United States* v. *Diebold, Inc.*, 369 U. S. 654, 655 (1962), we think respondent's failure to show there was no policeman in the store requires reversal.

Pointing to Rule 56 (e), as amended in 1963,[18] respondent argues that it was incumbent on petitioner to come forward with an affidavit properly asserting the presence of the policeman in the store, if she were to rely on that fact to avoid summary judgment. Respondent notes in this regard that none of the materials upon which petitioner relied met the requirements of Rule 56 (e).[19]

This argument does not withstand scrutiny, however, for both the commentary on and background of the 1963 amendment conclusively show that it was not intended to modify the burden of the moving party under Rule 56 (c) to show initially the absence of a genuine issue concerning any material fact.[20] The Advisory Commit-

---

[18] The amendment added the following to Rule 56 (e):

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

[19] Petitioner's statement at her deposition, see n. 13, *supra*, was, of course, hearsay; and the statement of Miss Sullivan, see n. 14, *supra*, was unsworn. And, the rule specifies that reliance on allegations in the complaint is not sufficient. See Fed. Rule Civ. Proc. 56 (e).

[20] The purpose of the 1963 amendment was to overturn a line of cases, primarily in the Third Circuit, that had held that a party opposing summary judgment could successfully create a dispute as to a material fact asserted in an affidavit by the moving party simply by relying on a contrary allegation in a well-pleaded complaint. *E. g., Frederick Hart & Co.* v. *Recordgraph Corp.*, 169 F. 2d 580 (1948); *United States ex rel. Kolton* v. *Halpern*, 260 F. 2d 590 (1958). See Advisory Committee Note on 1963 Amendment to subdivision (e) of Rule 56.

tee note on the amendment states that the changes were not designed to "affect the ordinary standards applicable to the summary judgment." And, in a comment directed specifically to a contention like respondent's, the Committee stated that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented.*" [21] Because respondent did not meet its initial burden of establishing the absence of a policeman in the store, petitioner here was not required to come forward with suitable opposing affidavits. [22]

If respondent had met its initial burden by, for example, submitting affidavits from the policemen denying their presence in the store at the time in question, Rule 56 (e) would then have required petitioner to have done more than simply rely on the contrary allegation in her complaint. To have avoided conceding this fact for purposes of summary judgment, petitioner would have had to come forward with either (1) the affidavit of someone who saw the policeman in the store or (2) an affidavit under Rule 56 (f) explaining why at that time it was impractical to do so. Even though not essential here to defeat

---

[21] *Ibid.* (emphasis added).

[22] In *First National Bank* v. *Cities Service,* 391 U. S. 253 (1968), the petitioner claimed that the lower courts had misapplied Rule 56 (e) to shift the burden imposed by Rule 56 (c). In rejecting this contention, we said: "Essentially all that the lower courts held in this case was that Rule 56 (e) placed upon [petitioner] the burden of producing evidence of the conspiracy he alleged only *after respondent . . . conclusively showed that the facts upon which he relied to support his allegation were not susceptible of the interpretation which he sought to give them.*" Id., at 289 (Emphasis added.) In this case, on the other hand, we hold that respondent failed to show conclusively that a fact alleged by petitioner was "not susceptible" of an interpretation that might give rise to an inference of conspiracy.

respondent's motion, the submission of such an affidavit would have been the preferable course for petitioner's counsel to have followed. As one commentator has said:

"It has always been perilous for the opposing party neither to proffer any countering evidentiary materials nor file a 56 (f) affidavit. And the peril rightly continues [after the amendment to Rule 56 (e)]. Yet the party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required." 6 J. Moore, Federal Practice ¶ 56.22 [2], pp. 2824–2825 (2d ed. 1966).

## II

There remains to be discussed the substantive count of petitioner's complaint, and the showing necessary for petitioner to prove that respondent refused her service "under color of any ... custom, or usage, of [the] State" in violation of her rights under the Equal Protection Clause of the Fourteenth Amendment.[23]

---

[23] Petitioner also appears to argue that, quite apart from custom, she was refused service under color of the state trespass statute, *supra*, n. 2. It should be noted, however, that this trespass statute by its terms does not compel segregation of the races. Although such a trespass statute might well have invalid applications if used to compel segregation of the races through state trespass convictions, see *Robinson* v. *Florida*, 378 U. S. 153 (1964), the statute here was not so used in this case. Miss Adickes, although refused service, was not asked to leave the store, and was not arrested for a trespass arising from a refusal to leave pursuant to this statute. The majority below, because it thought the code provision merely restated the common law "allowing [restaurateurs] to serve whomever they wished," 409 F. 2d, at 126, concluded that a private discrimination on the basis of race pursuant to this pro-

### A. Custom or Usage

We are first confronted with the issue of whether a "custom" for purposes of § 1983 must have the force of law, or whether, as argued in dissent, no state involvement is required. Although this Court has never explicitly decided this question, we do not interpret the statute against an amorphous backdrop.

What is now 42 U. S. C. § 1983 came into existence as § 1 of the Ku Klux Klan Act of April 20, 1871, 17 Stat. 13. The Chairman of the House Select Committee which drafted this legislation described [24] § 1 as modeled after § 2 of the Civil Rights Act of 1866—a criminal provision that also contained language that forbade certain acts by any person "under color of any law, statute, ordinance, regulation, or custom," 14 Stat. 27. In the *Civil Rights Cases,* 109 U. S. 3, 16 (1883), the Court said of this 1866 statute: "This law is clearly corrective in its

---

vision would not fulfill the "state action" requirement necessary to show a violation of the Fourteenth Amendment. Judge Waterman, in dissent, argued that the statute changed the common law, and operated *to encourage* racial discrimination.

Because a factual predicate for statutory relief under § 1983 has not yet been established below, we think it inappropriate in the present posture of this case to decide the constitutional issue of whether or not proof that a private person knowingly discriminated on the basis of race pursuant to a state trespass statute like the one involved here would make out a violation of the Fourteenth Amendment. Whatever else may also be necessary to show that a person has acted "under color of [a] statute" for purposes of § 1983, see n. 44, *infra,* we think it essential that he act with the knowledge of and pursuant to that statute. The courts below have made no factual determinations concerning whether or not the Kress refusal to serve Miss Adickes was the result of action by a Kress employee who had knowledge of the trespass statute, and who was acting pursuant to it.

[24] Cong. Globe, 42d Cong., 1st Sess., App. 68 (statement by Rep. Shellabarger).

character, intended to counteract and furnish redress against State laws and proceedings, and *customs having the force of law,* which sanction the wrongful acts specified." (Emphasis added.) Moreover, after an exhaustive examination of the legislative history of the 1866 Act, both the majority and dissenting opinions [25] in *Jones v. Alfred H. Mayer Co.,* 392 U. S. 409 (1968), concluded that § 2 of the 1866 Civil Rights Act was intended to be limited to "deprivations perpetrated 'under color of law.'" [26] (Emphasis added.)

Quite apart from this Court's construction of the identical "under color of" provision of § 2 of the 1866 Act, the legislative history of § 1 of the 1871 Act, the lineal ancestor of § 1983, also indicates that the provision in question here was intended to encompass only conduct supported by state action. That such a limitation was intended for § 1 can be seen from an examination of the statements and actions of both the supporters and opponents of the Ku Klux Klan Act.

---

[25] 392 U. S., at 424–426 (majority opinion); *id.,* at 454–473 (HARLAN, J., dissenting).

[26] *Id.,* at 426. In arguing that § 1 of the 1866 Act (the predecessor of what is now 42 U. S. C. § 1982) was meant to cover private as well as governmental interference with certain rights, the Court in *Jones* said:

"Indeed, if § 1 had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all. For that section, which provided fines and prison terms for certain individuals who deprived others of rights 'secured or protected' by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed. . . . Hence the structure of the 1866 Act, as well as its language, points to the conclusion . . . [that] only those deprivations perpetrated 'under color of law' were to be criminally punishable under § 2." *Id.,* 424–426. The Court in *Jones* cited the legislative history of § 2 to support its conclusion that the section "was carefully drafted to exempt private violations" and punish only *"governmental* interference." *Id.,* at 424–425 and n. 33.

In first reporting the Committee's recommendations to the House, Representative Shellabarger, the Chairman of the House Select Committee which drafted the Ku Klux Klan Act, said that § 1 was *"in its terms carefully confined to giving a civil action for such wrongs against citizenship as are done under color of State laws* which abridge these rights." [27]    (Emphasis added.)    Senator Edmunds, Chairman of the Senate Committee on the Judiciary, and also a supporter of the bill, said of this provision: "The first section is one that I believe nobody objects to, as defining the rights secured by the Constitution of the United States when they are *assailed by any State law or under color of any State law,* and it is merely carrying out the principles of the civil rights bill, which have since become a part of the Constitution." [28] (Emphasis added.)    Thus, in each House, the leader of those favoring the bill expressly stated his understanding that § 1 was limited to deprivations of rights done under color of law.

That Congress intended to limit the scope of § 1 to actions taken under color of law is further seen by contrasting its legislative history with that of other sections of the same Act.    On the one hand, there was comparatively little debate over § 1 of the Ku Klux Klan Act, and it was eventually enacted in form identical to that in which it was introduced in the House.[29]    Its history thus stands in sharp contrast to that of other sections

---

[27] Cong. Globe, 42d Cong., 1st Sess., App. 68.

[28] *Id.,* at 568 (emphasis added), quoted in *Monroe* v. *Pape, supra,* at 171; see also Cong. Globe, *supra,* at App. 79 (Rep. A. Perry) (§ 1 understood to remedy injuries done "under color of State authority").

[29] Compare *id.,* at App. 68 with 17 Stat. 13. See *id.,* at 568; App. 153–154 (Rep. Garfield).

of the Act.[30] For example, § 2 of the 1871 Act,[31] a provision aimed at private conspiracies with no "under color of law" requirement, created a great storm of controversy, in part because it was thought to encompass private conduct. Senator Thurman, for example, one of the leaders of the opposition to the Act, although objecting to § 1 on other grounds, admitted its constitutionality [32] and characterized it as "refer[ring] to a deprivation under color of law, either statute law *or 'custom or usage' which has become common law.*" [33] (Emphasis added.) This same Senator insisted vociferously on the absence of congressional power under § 5 of the Four-

---

[30] Throughout the debates, for example, "moderates" who expressed no opposition to § 1, objected to other proposals that they saw as allowing the Federal Government to take over the State's traditional role of punishing unlawful conduct of private parties. See, *e. g.,* *id.,* at 578–579 (Sen. Trumbull, the author of the 1866 Act); 514 (Rep. Poland); App. 153 (Rep. Garfield).

[31] Section 2 of the Ku Klux Klan Act is, as amended, 42 U. S. C. § 1985 (3). In *Collins* v. *Hardyman,* 341 U. S. 651 (1951), in order to avoid deciding whether there was congressional power to allow a civil remedy for purely private conspiracies, the Court in effect interpreted § 1985 (3) to require action under color of law even though this element is not found in the express terms of the statute. In a dissent joined by Mr. Justice Black and Mr. Justice Douglas, Mr. Justice Burton said of § 1985 (3): "The language of the statute refutes the suggestion that action under color of state law is a necessary ingredient of the cause of action which it recognizes. . . . When Congress, at this period, did intend to limit comparable civil rights legislation to action under color of state law, it said so in unmistakable terms," citing and quoting what is now § 1983. *Id.,* at 663–664. Without intimating any view concerning the correctness of the Court's interpretation of § 1985 (3) in *Collins,* we agree with the dissenters in that case that Congress in enacting what is now § 1983 "said . . . in unmistakable terms" that action under color of law is necessary.

[32] Cong. Globe, *supra,* at App. 216.

[33] *Id.,* at App. 217; see also *id.,* at App. 268 (Rep. Sloss).

teenth Amendment to penalize a conspiracy of private individuals to violate state law.[34] The comparative lack of controversy concerning § 1, in the context of the heated debate over the other provisions, suggests that the opponents of the Act, with minor exceptions, like its proponents understood § 1 to be limited to conduct under color of law.

In addition to the legislative history, there exists an unbroken line of decisions, extending back many years, in which this Court has declared that action "under color of *law*" is a predicate for a cause of action under § 1983,[35] or its criminal counterpart, 18 U. S. C. § 242.[36] Moreover, with the possible exception of an exceedingly opaque district court opinion,[37] every lower court opinion of which we are aware that has considered the issue, has concluded that a "custom or usage" for purposes of § 1983 requires state involvement and is not simply a practice that reflects longstanding social habits, gen-

---

[34] *Id.*, at App. 218.

[35] *E. g., Pierson* v. *Ray*, 386 U. S. 547, 554 (1967); *Monroe* v. *Pape, supra; Smith* v. *Allwright*, 321 U. S. 649 (1944).

[36] *United States* v. *Price*, 383 U. S. 787, 794 n. 7 (1966); *Williams* v. *United States, supra; Screws* v. *United States, supra*, at 109; *United States* v. *Classic, supra*, at 326–329. Section 242 of 18 U. S. C. is the direct descendant of § 2 of the 1866 Civil Rights Act. See n. 26, *supra*.

[37] In *Gannon* v. *Action*, 303 F. Supp. 1240 (D. C. E. D. Mo. 1969), the opinion on the one hand said that "Section 1983 . . . requires that the action for which redress is sought be under 'color' of state law." It then went on to decide that the defendants under color of a "custom of [*sic*] usage of the State of Missouri . . . [of] undisturbed worship by its citizens according to the dictates of their consciences" entered a St. Louis cathedral, disrupted a service and thus "deprived plaintiffs of their constitutional rights of freedom of assembly, speech, and worship, and to use and enjoy their property, all in violation of section 1983," *id.*, at 1245. See 23 Vand. L. Rev. 413, 419–420 (1970).

erally observed by the people in a locality.[38]   Finally, the language of the statute itself points in the same direction for it expressly requires that the "custom or usage" be that "of any *State*," not simply of the people living in a state.   In sum, against this background, we think it clear that a "custom, or usage, of [a] State" for purposes of § 1983 must have the force of law by virtue of the persistent practices of state officials.

Congress included customs and usages within its definition of law in § 1983 because of the persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South.   As Representative Garfield said: "[E]ven where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." [39]   Although not authorized by written law, such

---

[38] *Williams* v. *Howard Johnson's, Inc.*, 323 F. 2d 102 (C. A. 4th Cir. 1963); *Williams* v. *Hot Shoppes, Inc.*, 110 U. S. App. D. C. 358, 363, 293 F. 2d 835, 840 (1961) ("As to the argument based upon the 'custom or usage' language of the statute, we join with the unanimous decision of the Fourth Circuit in support of the proposition that—'The customs of the people of a state do not constitute state action within the prohibition of the Fourteenth Amendment,'" quoting from *Williams* v. *Howard Johnson's Restaurant*, 268 F. 2d 845, 848 (C. A. 4th Cir. 1959)), and 110 U. S. App. D. C., at 367–368, 293 F. 2d, at 844–845 (Bazelon, J., dissenting); see *Slack* v. *Atlantic White Tower System*, 181 F. Supp. 124, 127–128, 130 (D. C. Md.), aff'd, 284 F. 2d 746 (C. A. 4th Cir. 1960).

It should also be noted that the dissenting opinion below thought a "custom or usage" had to have the force of law.   409 F. 2d, at 128.

[39] Cong. Globe, 42d Cong., 1st Sess., App. 153.   MR. JUSTICE BRENNAN, *post*, at 219, 230, infers from this statement that Rep. Garfield thought § 1983 was meant to provide a remedy in circumstances where the State had failed to take affirmative action to prevent widespread private discrimination.   Such a reading of the statement is too broad, however.   All Rep. Garfield said was that a

practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.

This interpretation of custom recognizes that settled practices of state officials may, by imposing sanctions or withholding benefits, transform private predilections into compulsory rules of behavior no less than legislative pronouncements. If authority be needed for this truism, it can be found in *Nashville, C. & St. L. R. Co.* v. *Browning*, 310 U. S. 362 (1940), where the Court held that although a statutory provision suggested a different note, the "law" in Tennessee as established by longstanding practice of state officials was that railroads and public utilities were taxed at full cash value. What Justice Frankfurter wrote there seems equally apt here:

> "It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it. Settled state practice . . . can establish what is state law. The Equal Protection Clause did not write an empty formalism into the Constitution. Deeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." *Id.*, at 369.

And in circumstances more closely analogous to the case at hand, the statements of the chief of police and mayor of New Orleans, as interpreted by the Court

---

State, through the practices of its officials, could deny a person equal protection of the laws by the "systematic maladministration" of, or "a neglect or refusal to enforce" written laws that were "just and equal on their face." Official-inaction in the sense of neglecting to enforce laws already on the books is quite different from the inaction implicit in the failure to enact corrective legislation.

in *Lombard* v. *Louisiana,* 373 U. S. 267 (1963), could well have been taken by restaurant proprietors as articulating a custom having the force of law. Cf. *Garner* v. *Louisiana,* 368 U. S. 157, 176–185 (DOUGLAS, J., concurring) (1961); *Wright* v. *Georgia,* 373 U. S. 284 (1963); *Baldwin* v. *Morgan,* 287 F. 2d 750, 754 (C. A. 5th Cir. 1961).

### B. STATE ACTION—14TH AMENDMENT VIOLATION

For petitioner to recover under the substantive count of her complaint, she must show a deprivation of a right guaranteed to her by the Equal Protection Clause of the Fourteenth Amendment. Since the "action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States," *Shelley* v. *Kraemer,* 334 U. S.. 1, 13 (1948), we must decide, for purposes of this case, the following "state action" issue: Is there sufficient state action to prove a violation of petitioner's Fourteenth Amendment rights if she shows that Kress refused her service because of a state-enforced custom compelling segregation of the races in Hattiesburg restaurants?

In analyzing this problem, it is useful to state two polar propositions, each of which is easily identified and resolved. On the one hand, the Fourteenth Amendment plainly prohibits a State itself from discriminating because of race. On the other hand, § 1 of the Fourteenth Amendment does not forbid a private party, not acting against a backdrop of state compulsion or involvement, to discriminate on the basis of race in his personal affairs as an expression of his own personal predilections. As was said in *Shelley* v. *Kraemer, supra,* § 1 of "[t]hat Amendment erects no shield against merely private conduct, however discriminatory or wrongful." 334 U. S., at 13.

At what point between these two extremes a State's involvement in the refusal becomes sufficient to make the private refusal to serve a violation of the Fourteenth Amendment, is far from clear under our case law. If a State had a law requiring a private person to refuse service because of race, it is clear beyond dispute that the law would violate the Fourteenth Amendment and could be declared invalid and enjoined from enforcement. Nor can a State enforce such a law requiring discrimination through either convictions of proprietors who refuse to discriminate, or trespass prosecutions of patrons who, after being denied service pursuant to such a law, refuse to honor a request to leave the premises.[40]

The question most relevant for this case, however, is a slightly different one. It is whether the decision of an owner of a restaurant to discriminate on the basis of race under the compulsion of state law offends the Fourteenth Amendment. Although this Court has not explicitly decided the Fourteenth Amendment state action issue implicit in this question, underlying the Court's decisions in the sit-in cases is the notion that a State is responsible for the discriminatory act of a private party when the State, by its law, has compelled the act. As the Court said in *Peterson* v. *City of Greenville,* 373 U. S. 244, 248 (1963): "When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in it." Moreover, there is much support in lower court opinions for the conclusion that discriminatory acts by private parties done under the compulsion of state law offend the Fourteenth

---

[40] *E. g., Peterson* v. *City of Greenville,* 373 U. S. 244 (1963); *Robinson* v. *Florida,* 378 U. S. 153 (1964); see *Lombard* v. *Louisiana,* 373 U. S. 267 (1963); *Shuttlesworth* v. *Birmingham,* 373 U. S. 262 (1963).

Amendment. In *Baldwin* v. *Morgan, supra,* the Fifth Circuit held that "[t]he very act of posting and maintaining separate [waiting room] facilities when done by the [railroad] Terminal as commanded by these state orders is action by the state." The Court then went on to say: "As we have pointed out above the State may not use race or color as the basis for distinction. *It may not do so by direct action or through the medium of others who are under State compulsion to do so."* *Id.,* at 755–756 (emphasis added). We think the same principle governs here.

For state action purposes it makes no difference of course whether the racially discriminatory act by the private party is compelled by a statutory provision or by a custom having the force of law—in either case it is the State that has commanded the result by its law. Without deciding whether less substantial involvement of a State might satisfy the state action requirement of the Fourteenth Amendment, we conclude that petitioner would show an abridgment of her equal protection right, if she proves that Kress refused her service because of a state-enforced custom of segregating the races in public restaurants.

## C. Three Additional Points

For purposes of remand, we consider it appropriate to make three additional points.

First, the District Court's pretrial opinion seems to suggest that the exclusive means available to petitioner for demonstrating that state enforcement of the custom relevant here would be by showing that the State used its criminal trespass statute for this purpose. We disagree with the District Court's implicit assumption that a custom can have the force of law only if it is enforced

by a state statute.[41]  Any such limitation is too restrictive, for a state official might act to give a custom the force of law in a variety of ways, at least two examples of which are suggested by the record here.  For one thing, petitioner may be able to show that the police subjected her to false arrest for vagrancy for the purpose of harassing and punishing her for attempting to eat with black people.[42]  Alternatively, it might be shown on remand that the Hattiesburg police would intentionally tolerate violence or threats of violence directed toward those who violated the practice of segregating the races at restaurants.[43]

---

[41] Because it thought petitioner had failed to prove the existence of a custom, the majority of the Second Circuit explicitly refused to decide whether petitioner had to prove "the custom or usage was enforced by a state statute," 409 F. 2d, at 125.

[42] Together with some other civil rights workers also being prosecuted on vagrancy charges, Miss Adickes, in a separate action, removed the state vagrancy prosecution against her to a federal court on the ground that the arrest and prosecution were in retaliation for her attempt to exercise her rights under the Public Accommodations Title of the 1964 Civil Rights Act.  The District Court remanded the charge to the state courts, but the Fifth Circuit reversed, finding that "[t]he utter baselessness of any conceivable contention that the vagrancy statutes prohibited any conduct in which these persons were engaged, merely buttresses the undisputed evidence before the trial court when the order of remand was entered that these protected acts [i. e., "attempts to enjoy equal public accommodations in the Hattiesburg City Library, and a restaurant in the nationally known Kress store"] constituted the conduct for which they were then and there being arrested." Achtenberg v. Mississippi, 393 F. 2d 468, 474 (C. A. 5th Cir. 1968).  Although one judge dissented on the ground that Miss Adickes' case was not properly removable under Georgia v. Rachel, 384 U. S. 780 (1966), he too thought that the "vagrancy charges against Miss Adickes were shown to be baseless and an unsophisticated subterfuge," id., at 475.

[43] See n. 10, supra.

Second, we think the District Court was wrong in ruling that the only proof relevant to showing a custom in this case was that demonstrating a specific practice of not serving white persons who were in the company of black persons in public restaurants. As Judge Waterman pointed out in his dissent below, petitioner could not possibly prove a "long and unvarying" habit of serving only the black persons in a "mixed" party of whites and blacks for the simple reason that "it was only after the Civil Rights Act of 1964 became law that Afro-Americans had an opportunity to be served in Mississippi 'white' restaurants" at all, 409 F. 2d, at 128. Like Judge Waterman, we think the District Court viewed the matter too narrowly, for under petitioner's complaint the relevant inquiry is whether at the time of the episode in question there was a longstanding and still prevailing state-enforced custom of segregating the races in public eating places. Such a custom, of course, would perforce encompass the particular kind of refusal to serve challenged in this case.

Third, both the District Court and the majority opinion in the Court of Appeals suggested that petitioner would have to show that the relevant custom existed throughout the State, and that proof that it had the force of law in Hattiesburg—a political subdivision of the State—was insufficient. This too we think was error. In the same way that a law whose source is a town ordinance can offend the Fourteenth Amendment even though it has less than state-wide application, so too can a custom with the force of law in a political subdivision of a State offend the Fourteenth Amendment even though it lacks state-wide application.

In summary, if petitioner can show (1) the existence of a state-enforced custom of segregating the races in public eating places in Hattiesburg at the time of the inci-

dent in question; and (2) that Kress' refusal to serve her was motivated by that state-enforced custom, she will have made out a claim under § 1983.[44]

For the foregoing reasons we think petitioner is entitled to a new trial on the substantive count of her complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the decision of this case.

---

[44] Any notion that a *private* person is necessarily immune from liability under § 1983 because of the *"under color of"* requirement of the statute was put to rest by our holding in *United States* v. *Price, supra,* see n. 7, *supra.* There, in the context of a conspiracy, the Court said: "To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State . . . ," *id.,* at 794. Because the core of congressional concern in enacting § 1983 was to provide a remedy for violations of the Equal Protection Clause arising from racial discrimination, we think that a private person who discriminates on the basis of race with the knowledge of and pursuant to a state-enforced custom requiring such discrimination, is a "participant in joint activity with the State," and is acting "under color of" that custom for purposes of § 1983.

We intimate no views concerning the relief that might be appropriate if a violation is shown. See *Williams* v. *Hot Shoppes, Inc.,* 110 U. S. App. D. C. 358, 370–371, 293 F. 2d 835, 847–848 (1961) (Bazelon, J., dissenting). The parties have not briefed these remedial issues, and if a violation is proved they are best explored in the first instance below in light of the new record that will be developed on remand. Nor do we mean to determine at this juncture whether there are any defenses available to defendants in § 1983 actions like the one at hand. Cf. *Pierson* v. *Ray,* 386 U. S. 547 (1967).

Mr. Justice Black, concurring in the judgment.

The petitioner, Sandra Adickes, brought suit against the respondent, S. H. Kress & Co., to recover damages for alleged violations of 42 U. S. C. § 1983. In one count of her complaint she alleged that a police officer of the City of Hattiesburg, Mississippi, had conspired with employees of Kress to deprive her of rights secured by the Constitution and that this joint action of a state official and private individuals was sufficient to constitute a violation of § 1983. She further alleged in another count that Kress' refusal to serve her while she was in the company of Negroes was action "under color of" a custom of refusing to serve Negroes and whites together in Mississippi, and that this action was a violation of § 1983. The trial judge granted a motion for summary judgment in favor of Kress on the conspiracy allegation and, after full presentation of evidence by the petitioner, granted a motion for a directed verdict in favor of the respondent on the custom allegation. Both decisions rested on conclusions that there were no issues of fact supported by sufficient evidence to require a jury trial. I think the trial court and the Court of Appeals which affirmed were wrong in allowing summary judgment on the conspiracy allegation. And—assuming for present purposes that the trial court's statutory interpretation concerning "custom or usage" was correct—it was also error to direct a verdict on that count. In my judgment, on this record, petitioner should have been permitted to have the jury consider both her claims.

Summary judgments may be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Fed. Rule Civ. Proc. 56 (c). Petitioner in this case alleged that she went into Kress in the company of Negroes

and that the waitress refused to serve her, stating "[w]e have to serve the colored, but we are not going to serve the whites that come in with them." Petitioner then alleged that she left the store with her friends and as soon as she stepped outside a policeman arrested her and charged her with vagrancy. On the basis of these facts she argued that there was a conspiracy between the store and the officer to deprive her of federally protected rights. The store filed affidavits denying any such conspiracy and the trial court granted the motion for summary judgment, concluding that petitioner had not alleged any basic facts sufficient to support a finding of conspiracy.

The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide. In this case petitioner may have had to prove her case by impeaching the store's witnesses and appealing to the jury to disbelieve all that they said was true in the affidavits. The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller* v. *Columbia Broadcasting*, 368 U. S. 464, 473 (1962).

Second, it was error for the trial judge to direct a verdict in favor of the respondent on the "custom"

count. The trial judge surveyed the evidence and concluded that it was insufficient to prove the existence of a custom of not serving white people in the company of Negroes. He thereupon took the case away from the jury, directing a verdict for the respondent. The Court of Appeals affirmed this conclusion. In my opinion this was clear error.

Petitioner testified at trial as follows:

"Q. Did you have occasion to know of specific instances where white persons in the company of Negroes were discriminated against? A. Yes.

"Q. How many such instances can you recall? A. I can think of about three at the moment.

"Q. Will you describe the three instances to us? A. I know that people were turned away from a white church, an integrated group was turned away from a white church in Hattiesburg. I was not present but this was explained to me. I saw a rabbi being beaten because he was in the company of Negroes.

"Q. This was a white rabbi? A. Yes. And people were turned away from a drug store in Hattiesburg, an integrated group. I don't remember the name of the drug store.

"Q. On the basis of what you studied and on the basis of what you observed, and on the basis of your conversations with other persons there, did you come to a conclusion with regard to the custom and usage with regard to the white community towards serving persons, white persons, in the company of Negroes? A. Yes.

"Q. What was that conclusion? A. The conclusion was that white persons—it was a custom and usage not to serve white persons in the company of Negroes."

This evidence, although weakened by the cross-examination, was sufficient, I think, to require the court to let the case go to the jury and secure petitioner's constitutionally guaranteed right to a trial by that jury. See *Galloway* v. *United States*, 319 U. S. 372, 396 (1943) (BLACK, J., dissenting).

I do not find it necessary at this time to pass on the validity of the statutory provision concerning "custom or usage" or on the trial court's views, concurred in by the Court of Appeals, on the proper interpretation of that term. Assuming that the trial court's interpretation was correct and that the provision as so interpreted is valid, there was enough evidence in this record to warrant submitting the entire question of custom or usage to the jury in accordance with instructions framed to reflect those views.

For the foregoing reasons I concur in the judgment reversing the Court of Appeals and remanding for a new trial on both counts.

MR. JUSTICE DOUGLAS, dissenting in part.

I

The statutory words "under color of any statute, ordinance, regulation, custom, or usage, of any State," 42 U. S. C. § 1983, are seriously emasculated by today's ruling. Custom, it is said, must have "the force of law"; and "law," as I read the opinion, is used in the Hamiltonian sense.[1]

---

[1] The Federalist, No. 15:

"It is essential to the idea of a law, that it be attended with a sanction; or, in other words, a penalty or punishment for disobedience. If there be no penalty annexed to disobedience, the resolutions or commands which pretend to be laws will, in fact, amount to nothing more than advice or recommendation. This penalty, whatever it may be, can only be inflicted in two ways: by the agency of the courts and ministers of justice, or by military force; by the COERCION of the magistracy, or by the COERCION of arms."

The Court requires state involvement in the enforcement of a "custom" before that "custom" can be actionable under 42 U. S. C. § 1983. That means, according to the Court, that "custom" for the purposes of § 1983 "must have the force of law by virtue of the persistent practices of state officials." That construction of § 1983 is, to borrow a phrase from the first Mr. Justice Harlan, "too narrow and artificial." *Civil Rights Cases,* 109 U. S. 3, 26 (dissenting opinion).

Section 1983 by its terms protects all "rights" that are "secured by the Constitution and laws" of the United States. There is no more basic "right" than the exemption from discrimination on account of race—an exemption that stems not only from the Equal Protection Clause of the Fourteenth Amendment but also from the Thirteenth Amendment and from a myriad of "laws" enacted by Congress. And so far as § 1983 is concerned it is sufficient that the deprivation of that right be "under color" of "any . . . custom . . . of any State." The "custom" to be actionable must obviously reflect more than the prejudices of a few; it must reflect the dominant communal sentiment.

## II

The "custom . . . of any State" can of course include the predominant attitude backed by some direct or indirect sanctions inscribed in law books. Thus in *Garner* v. *Louisiana,* 368 U. S. 157, another restaurant case involving racial discrimination, there was no state law or municipal ordinance that in terms required segregation of the races in restaurants. But segregation was basic to the structure of Louisiana as a community as revealed by a mosaic of laws. *Id.,* at 179–181 (concurring opinion).

The same is true of Mississippi in the present case.

In 1964, at the time of the discrimination perpetrated in this case, there were numerous Mississippi laws that were designed to continue a regime of segregation of

the races. The state legislature had passed a resolution condemning this Court's *Brown* v. *Board of Education* decisions, 347 U. S. 483, 349 U. S. 294, as "unconstitutional" infringements on States' rights. Miss. Laws 1956, c. 466, Senate Concurrent Resolution No. 125. Part of the Mississippi program to perpetuate the segregated way of life was the State Sovereignty Commission, Miss. Code Ann. § 9028–31 *et seq.* (1956), of which the Governor was chairman and which was charged with the duty "to do and perform any and all acts and things deemed necessary and proper to protect the sovereignty of the State of Mississippi . . . from encroachment thereon by the Federal Government . . . ." *Id.*, § 9028–35. Miss. Code Ann. § 4065.3 (1956) required "the entire executive branch of the government of the State of Mississippi . . . to prohibit by any lawful, peaceful, and constitutional means, the causing of a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this state, by any branch of the federal government . . . ." Every word and deed of a state officer, agent, or employee that was connected with maintaining segregated schools in Mississippi was deemed to be "the sovereign act . . . of the sovereign State of Mississippi." *Id.*, § 4065.4 (Supp. 1968). It was unlawful for a white student to attend any school of high school or lower level that was also attended by Negro students. *Id.*, § 6220.5. Separate junior college districts were established for blacks and whites. *Id.*, § 6475–14 (1952). The Ellisville State School for the feeble-minded was required to provide for separate maintenance of blacks and whites. *Id.*, § 6766. The State Insane Hospital was required to keep the two races separate, *id.*, § 6883, as was the South Mississippi Charity Hospital. *Id.*, § 6927. Separate entrances were required to be maintained at state hos-

pitals for black and white patients. *Id.,* § 6973. It was the responsibility of those in authority to furnish a sufficient number of Negro nurses to attend Negro patients, but the Negro nurses were to be under the supervision of white supervisors. *Id.,* § 6974. It was unlawful for Negro and white convicts to be confined or worked together. *Id.,* § 7913 (1956). County sheriffs were required to maintain segregated rooms in the jails. *Id.,* § 4259. It was unlawful for taxicab drivers to carry black and white passengers together. *Id.,* § 3499. Railroad depots in cities of 3,000 or more inhabitants were required to have separate "closets" for blacks and whites. *Id.,* § 7848. And it was a crime to overthrow the segregation laws of the State. *Id.,* § 2056 (7).

The situation was thus similar to that which existed in *Garner.* Although there was no law that in terms required segregation of the races in restaurants, it was plain that the discrimination was perpetrated pursuant to a deeply entrenched custom in Louisiana that was "at least as powerful as any law." *Garner* v. *Louisiana, supra,* at 181 (concurring opinion); cf. *Robinson* v. *Florida,* 378 U. S. 153, 156.

### III

The "custom . . . of any State," however, can be much more pervasive. It includes the unwritten commitment, stronger than ordinances, statutes, and regulations, by which men live and arrange their lives. Bronislaw Malinowski, the famed anthropologist, in speaking of the "cake of custom" of a Melanesian community "safeguarding life, property and personality" said:[2]

> "There is no religious sanction to these rules, no fear, superstitious or rational, enforces them, no

---

[2] B. Malinowski, Crime and Custom in Savage Society 66–67 (1932).

tribal punishment visits their breach, nor even the stigma of public opinion or moral blame. The forces which make these rules binding we shall lay bare and find them not simple but clearly definable, not to be described by one word or one concept, but very real none the less. The binding forces of Melanesian civil law are to be found in the concatenation of the obligations, in the fact that they are arranged into chains of mutual services, a give and take extending over long periods of time and covering wide aspects of interest and activity. To this there is added the conspicuous and ceremonial manner in which most of the legal obligations have to be discharged. This binds people by an appeal to their vanity and self-regard, to their love of self-enhancement by display. Thus the binding force of these rules is due to the natural mental trend of self-interest, ambition and vanity, set into play by a special social mechanism into which the obligatory actions are framed."

This concept of "custom" is, I think, universal and as relevant here as elsewhere. It makes apparent that our problem under 42 U. S. C. § 1983 does not make our sole aim the search for "state action" in the Hamiltonian sense of "law."

That restricted kind of a search certainly is not compelled by grammar. "Of" is a word of many meanings, one of which indicates "the thing or person whence anything originates, comes, is acquired or sought." 7 Oxford English Dictionary (definition III). The words "under color of any . . . custom . . . of any State" do no more than describe the geographical area or political entity in which the "custom" originates and where it is found.

The philosophy of the Black Codes reached much further than the sanctions actually prescribed in them. Federal judges, who entered the early school desegrega-

tion decrees, often felt the ostracism of the community, though the local "law" never even purported to place penalties on judges for doing such acts. Forty years ago in Washington, D. C., a black who was found after the sun set in the northwest section of the District on or above Chevy Chase Circle was arrested, though his only "crime" was waiting for a bus to take him home after caddying at a plush golf course in the environs. There was no "law" sanctioning such an arrest. It was done "under color" of a "custom" of the Nation's Capital.

Harry Golden [3] recently wrote:

> "Southerners drew a line and prohibited Negroes crossing it. They doomed themselves to a lifetime of guarding that line, fearing it would be breached. Because the white Southerner must forever watch that line, the Negro intrudes upon the white at every level of life."

Is not the maintenance of that line by habit a "custom?"

Title 42 U. S. C. § 1983 was derived from § 1 of the "Ku Klux Klan Act" of 1871, 17 Stat. 13. The "under color of" provisions of § 1 of the 1871 Act, in turn, were derived from § 2 of the Civil Rights Act of 1866, 14 Stat. 27. The meaning of "under color of . . . custom" in the context of the 1866 Act is therefore relevant to the meaning of that phrase as it is used in § 1983, for, as the Court states, the "under color of" provisions mean the same thing for § 1983 as they do for 18 U. S. C. § 242, the direct descendant of § 2 of the 1866 Act.[4] *Ante,* at 152 n. 7.

---

[3] Book Guide, Boston Sunday Herald Traveler, February 22, 1970, p. 2.

[4] Section 2 of the 1866 Act, which we discussed in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, 424–426, made it a criminal offense for any person "under color of any law, statute, ordinance, regulation, or custom" to subject any inhabitant of "any State or Territory to the

A "custom" of the community or State was one of the targets of the Civil Rights Act of 1866. Section 1, which we upheld in *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, provided a civil remedy for specified private acts of racial discrimination. Section 2 of that Act provided criminal sanctions for acts done "under color of any" custom of a State. A Congress that in 1866 was not bent only on "the nullification of racist laws," *id.,* at 429, was not restricting itself strictly to state action; it was out to ban racial discrimination partly as respects private actions, partly under state law in the Hamiltonian sense, and partly under the color of "custom."

Of course, § 2 of the 1866 Act did not cover purely private actions as did § 1 of the Act, and that was the point of our discussion of § 2 in *Jones* v. *Alfred H. Mayer Co.* But the Court does not come to grips with the fact that actions taken "under color of any . . . custom" were covered by § 2 of the 1866 Act quite apart from

deprivation of any right secured or protected by this act." The direct descendant of § 2 is 18 U. S. C. § 242, which, in an earlier form, was before the Court in *United States* v. *Classic,* 313 U. S. 299, and *Screws* v. *United States,* 325 U. S. 91. Section 242 provides:

"Whoever, *under color of any* law, statute, ordinance, regulation, or *custom,* willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year, or both." (Emphasis added.)

Section 1983 of 42 U. S. C. provides a civil remedy. It reads:

"Every person who, *under color of any* statute, ordinance, regulation, *custom,* or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." (Emphasis added.)

actions taken under "color of any statute, ordinance, [or] regulation"—in other words, quite apart from actions taken under "color of law" in the traditional sense. Instead, the Court seems to divide all actions into two groups—those constituting "state action" and those constituting purely "private action"—with coverage of § 2 limited to the former. While § 2 did not reach "private violations," it did reach discrimination based on "color of custom," which is far beyond the realm of a mere private predilection or prejudice. And, despite the Court's suggestion to the contrary, the use of the term "under color of law" by the Court in *Jones* v. *Alfred H. Mayer Co.* was merely a shorthand reference for all the "under color of" provisions in § 2 and had no relevance to the specific problem of defining the meaning of "under color of . . . custom." [5]

Section 2, like § 1, involved in *Jones* v. *Alfred H. Mayer Co.*, was bottomed on the Thirteenth Amendment, for it was enacted before the Fourteenth Amendment was adopted. As we stated in *Jones* v. *Alfred H. Mayer Co.*:

"Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the

----

[5] The meaning of "under color of . . . custom" was not before the Court in *Jones* v. *Alfred H. Mayer Co.*, and language from the Court's opinion in that case, taken out of context, can be highly misleading. For example, the language quoted in n. 26 of the Court's opinion in this case distinguished "private violations" covered by § 1 of the 1866 Act from "deprivations perpetrated 'under color of law'" covered by § 2 of the Act. The Court here interprets that use of the phrase "under color of law" to exclude actions taken "under color of . . . custom" *sans* state action. A more realistic interpretation of the quoted language, however, is that "under color of law" was merely being used by the Court as a shorthand phrase for "under color of any statute, ordinance, regulation, custom, or usage, of any State," and that the Court, without in any way addressing the question of the meaning of "custom," was merely using the phrase to distinguish purely private violations.

authority to translate that determination into effective legislation." *Id.*, at 440.

While the Privileges and Immunities Clause, the Due Process Clause, and the Equal Protection Clause of the Fourteenth Amendment are each protective of the individual as against "state" action, the guarantees of the Thirteenth Amendment and various laws of the United States are not so restricted. And § 1983 protects not only Fourteenth Amendment rights, but *"any* rights . . . secured by the Constitution and laws." With regard to § 1983's scope of protection for violations of these rights, Congress in § 1983 aimed partly at "state" action and it was with that aspect of it that we were concerned in *Monroe* v. *Pape,* 365 U. S. 167.

If the wrong done to the individual was under "color" of "custom" alone, the ingredients of the cause of action were satisfied.[6] The adoption of the Fourteenth Amend-

---

[6] The trial court restricted the evidence on custom to that which related to the specific practice of not serving white persons who were in the company of black persons in public restaurants. Such evidence was necessarily limited, as the Court points out, by the fact that it was only after the Civil Rights Act of 1964 went into effect that blacks could be served in " 'white' restaurants" in Mississippi at all. Although I agree with my Brother BLACK that the evidence introduced under this narrow definition of custom, as outlined in his opinion, was sufficient to require a jury trial on that question, I also agree with the Court's conclusion that the definition employed by the trial court was far too restrictive. Petitioner argued that the relevant custom was the custom against integration of the races, and that the refusal to serve a white person in the company of blacks was merely a specific manifestation of that custom. I think that petitioner's definition of custom is the correct one. There is abundant evidence in the record of a custom of racial segregation in Mississippi, and in Hattiesburg in particular. In fact the trial judge conceded, "I certainly don't dispute that it could be shown that there was a custom and usage of discrimination in the past. . . . It is certainly a way of life so far as the people in Mississippi were concerned."

ment expanded the substantive rights covered by § 1 of the 1871 Act *vis-à-vis* those covered by § 2 of the 1866 Act. But that expanded coverage did not make "state action" a necessary ingredient in all of the remedial provisions of § 1 of the 1871 Act. Neither all of § 1 of the 1871 Act nor all of its successor, § 1983, was intended to be conditioned by the need for "state" complicity.

Moreover, a majority of the Court held in *United States* v. *Guest,* 383 U. S. 745, 761, 774, 782 and n. 6, that § 5 of the Fourteenth Amendment enables Congress to punish interferences with constitutional rights "whether or not state officers or others acting under the color of state law are implicated." *Id.,* at 782. There the statute involved (18 U. S. C. § 241) proscribed all conspiracies to impair any right "secured" by the Constitution. A majority agreed that in order for a conspiracy to qualify it need not involve any "state" action. By the same reasoning the "custom . . . of any State" as used in § 1983 need not involve official state development, maintenance, or participation. The reach of § 1983 is constitutional rights, including those under the Fourteenth Amendment; and Congress rightfully was concerned with their full protection, whoever might be the instigator or offender.

To repeat, § 1983 was "one of the means whereby Congress exercised the power vested in it by § 5 of the Fourteenth Amendment to enforce the provisions of that Amendment." *Monroe* v. *Pape, supra,* at 171. Yet powers exercised by Congress may stem from more than one constitutional source. *McCulloch* v. *Maryland,* 4 Wheat. 316, 421; *Veazie Bank* v. *Fenno,* 8 Wall. 533, 548–549; *Edye* v. *Robertson,* 112 U. S. 580, 595–596; *United States* v. *Gettysburg Electric R. Co.,* 160 U. S. 668, 683. Moreover, § 1983 protects "any rights" that are "secured" by "the Constitution and laws"

of the United States, which makes unmistakably clear that § 1983 does not cover, reach, protect, or secure only Fourteenth Amendment rights. The Thirteenth Amendment and its enabling legislation cover a wide range of "rights" designed to rid us of all the badges of slavery. And, as I have said, the phrase "under color of any . . . custom" derives from § 2 of the 1866 Act which rested on the Thirteenth Amendment whose enforcement does not turn on "state action." [7] The failure of the Court to come to face with those realities leads to the regressive decision announced today.

It is time we stopped being niggardly in construing civil rights legislation. It is time we kept up with Congress and construed its laws in the full amplitude needed to rid their enforcement of the lingering tolerance for racial discrimination that we sanction today.

MR. JUSTICE BRENNAN, concurring in part and dissenting in part.

Petitioner contends that in 1964 respondent, while acting "under color of . . . statute" or "under color of . . . custom, or usage" of the State of Mississippi, subjected her to the deprivation of her right under the Equal Protection Clause of the Fourteenth Amendment not to be denied service in respondent's restaurant due to racial discrimination in which the State of Mississippi was involved, and that therefore respondent is liable to her in damages under 42 U. S. C. § 1983. To recover under § 1983 petitioner must prove two separate and independent elements: first, that respondent subjected her to the

---

[7] This case concerns only the meaning of "custom . . . of any State" as those words are used in § 1983. It does not involve the question whether under certain circumstances "custom" can constitute state action for purposes of the Fourteenth Amendment. See *Garner* v. *Louisiana, supra,* at 178–179 (concurring opinion).

deprivation of a right "secured by the Constitution and laws"; and, second, that while doing so respondent acted under color of a statute, ordinance, regulation, custom, or usage of the State of Mississippi.

Whether a person suing under § 1983 must show state action in the first element—the deprivation of a right "secured by the Constitution and laws"—depends on the nature of the particular right asserted. For example, a person may be deprived of a right secured by the Constitution and 42 U. S. C. § 1982 by a private person acting completely independently of state government. See *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968). On the other hand, the constitutional right to equal protection of the laws, unelaborated by any statute, can be violated only by action involving a State. The discussion in *United States* v. *Reese,* 92 U. S. 214, 249–252 (1876) (Hunt, J., dissenting), of various constitutional uses of the word "State" suggests that as an original matter "State" in the Equal Protection Clause might have been interpreted in any of several ways. Moreover, some have thought that historical evidence points to an interpretation covering some categories of state inaction in the face of wholly private conduct, see, *e. g., Bell* v. *Maryland,* 378 U. S. 226, 286–316 (1964) (Goldberg, J., concurring); R. Harris, The Quest for Equality 24–56 (1960); J. tenBroek, Equal Under Law 201–239 (1965). However, our cases have held that the Equal Protection Clause applies only to action by state government or officials and those significantly involved with them. *Shelley* v. *Kraemer,* 334 U. S. 1, 13 (1948); *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 721–722 (1961). Whether and when a person suing under § 1983 must show state action in the second element—action under color of a statute, ordinance, regulation, custom, or

usage of a State—depends on an analysis of the text, legislative history, and policy of § 1983. See Part II, *infra*. These two inquiries are wholly different, though in particular cases a showing of state action under one element may suffice under the other.

In the present case petitioner alleged as the first element under § 1983 a deprivation of her right to equal protection. Therefore, under our cases, she must show state action. She asserts that there was state action in two different respects. First, she contends that there was a conspiracy between respondent and local police to discriminate against her in restaurant service because she, a white person, sought service while accompanied by Negro friends. The Court treats this aspect of her claim in Part I of its opinion, which I join.[1] Petitioner contends, alternatively, that respondent's discrimination was authorized and encouraged by Mississippi statutes. To that contention I now turn.

I

The state-action doctrine reflects the profound judgment that denials of equal treatment, and particularly denials on account of race or color, are singularly grave when government has or shares responsibility for them. Government is the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct. Therefore something is uniquely amiss in a society where the government, the authoritative oracle of community values, involves itself in racial

---

[1] I do not agree with the statement on page 150 of the Court's opinion that the "second element [of § 1983] requires that the plaintiff show that the defendant acted 'under color of law.'" See Part II, *infra*.

discrimination. Accordingly, in the cases that have come before us this Court has condemned significant state involvement in racial discrimination, however subtle and indirect it may have been and whatever form it may have taken. See, *e. g., Burton* v. *Wilmington Parking Authority, supra; Evans* v. *Newton,* 382 U. S. 296 (1966); *Hunter* v. *Erickson,* 393 U. S. 385 (1969). These decisions represent vigilant fidelity to the constitutional principle that no State shall in any significant way lend its authority to the sordid business of racial discrimination.

Among the state-action cases that most nearly resemble the present one are the sit-in cases decided in 1963 and 1964. In *Peterson* v. *City of Greenville,* 373 U. S. 244 (1963), the petitioners were convicted of trespass for refusing to leave a lunch counter at a Kress store in South Carolina. A Greenville ordinance at that time imposed on the proprietors of restaurants the duty to segregate the races in their establishments, and there was evidence that the Kress manager was aware of the ordinance. We held that the existence of the ordinance, together with a showing that the Kress manager excluded the petitioners solely because they were Negroes, was sufficient to constitute discriminatory state action in violation of the Fourteenth Amendment:

> "When the State has commanded a particular result, it has saved to itself the power to determine that result and thereby 'to a significant extent' has 'become involved' in it, and, in fact, has removed that decision from the sphere of private choice. . . .
>
> "Consequently these convictions cannot stand, even assuming, as respondent contends, that the manager would have acted as he did independently of the existence of the ordinance." 373 U. S., at 248.

Although the case involved trespass convictions, the Court did not rely on the State's enforcement of its neutral trespass laws in analyzing the elements of state action present. Nor did it cite *Shelley* v. *Kraemer, supra,* the logical starting point for an analysis in terms of judicial enforcement. The denial of equal protection occurred when the petitioners were denied service in the restaurant. That denial of equal protection tainted the subsequent convictions. And as we noted in *Reitman* v. *Mulkey,* 387 U. S. 369, 380 (1967), no "proof [was] required that the restaurant owner had actually been influenced by the state statute . . . ." Thus *Peterson* establishes the proposition that where a State commands a class of persons to discriminate on the basis of race, discrimination by a private person within that class is state action, regardless of whether he was motivated by the command. The Court's intimation in the present case that private discrimination might be state action only where the private person acted under compulsion imposed by the State echoes MR. JUSTICE HARLAN's argument in *Peterson* that private discrimination is state action only where the State motivates the private person to discriminate. See 373 U. S., at 251–253. That argument was squarely rejected by the Court in *Peterson,* and I see no reason to resurrect it now.

The rationale of *Peterson* was extended in *Lombard* v. *Louisiana,* 373 U. S. 267 (1963). There the petitioners were convicted of trespass for refusing to leave a restaurant after being denied service. Prior to the arrests the mayor and superintendent of police of New Orleans had publicly stated that sit-in demonstrations were undesirable and that relevant trespass laws would be fully enforced. Although these statements, unlike the ordinance in *Peterson,* were not discriminatory on their face, the Court interpreted them

as evidencing state support for the system of racial segregation prevalent in the private institutions against which the petitioners' sit-in was directed. Moreover, the statements, unlike the ordinance in *Peterson,* did not command restaurateurs to discriminate. A restaurateur in New Orleans, unlike one in Greenville, could integrate his services without violating any law. Although there was evidence that the restaurateur's actions were influenced by the official statements, the Court did not rely on this factor. The Court held on the basis of the statements alone that the degree of state involvement in the private discriminatory denial of service to the petitioners was sufficient to make that denial state action violative of the Fourteenth Amendment. As in *Peterson,* the Court's analysis of state action did not turn on the actual enforcement of the State's criminal law. *Lombard,* therefore, advances at least two propositions. First, an authoritative expression of state policy that is nondiscriminatory on its face may be found to be discriminatory when considered against the factual background of its promulgation. Cf. *Guinn* v. *United States,* 238 U. S. 347, 364–365 (1915); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). Second, where a state policy enforces privately chosen racial discrimination in places of public accommodation, it renders such private discrimination unconstitutional state action, regardless of whether the private discriminator was motivated or influenced by it.

The principles of *Peterson* and *Lombard* were extended further in *Robinson* v. *Florida,* 378 U. S. 153 (1964). That case also involved trespass convictions arising out of a sit-in at a segregated restaurant. At the time, a Florida regulation required restaurants to maintain separate lavatory and toilet facilities for each race as well as each sex. However, the regulation did not require segregation of a restaurant itself; nor did the

convictions of the demonstrators result from anything they did with respect to the facilities that were the subject of the regulation. Nevertheless, this Court reversed the convictions on the ground that by virtue of the regulation the State had become sufficiently involved in the privately chosen segregation of the restaurant to make that segregation state action. The Court commented:

> "While these Florida regulations do not directly and expressly forbid restaurants to serve both white and colored people together, they certainly embody a state policy putting burdens upon any restaurant which serves both races, burdens bound to discourage the serving of the two races together." 378 U. S., at 156.

*Robinson* involved neither a state command of restaurant segregation, as in *Peterson*, nor a state policy of enforcing restaurant segregation, as in *Lombard*. It involved state imposition of burdens amounting to discouragement of private integration. It is true that the burden in that case happened to take the form of a requirement of segregated lavatory facilities; but any other burden—for example, a tax on integrated restaurants—would have sufficed to render the privately chosen restaurant segregation unconstitutional state action. Again, the Court's finding of state action did not depend on the use of the State's trespass law. *Robinson* thus stands for the proposition that state discouragement of a particular kind of privately chosen integration renders that kind of privately chosen segregation unconstitutional state action.

The step from *Peterson, Lombard,* and *Robinson* to the present case is a small one. Indeed, it may be no step at all, since those cases together hold that a state

policy of discouraging privately chosen integration or encouraging privately chosen segregation, even though the policy is expressed in a form nondiscriminatory on its face, is unconstitutional and taints the privately chosen segregation it seeks to bring about. These precedents suggest that the question of state action in this case is whether, as petitioner contends, Mississippi statutes do in fact manifest a state policy of encouraging and supporting restaurant segregation so that respondent's alleged privately chosen segregation is unconstitutional state action.

To establish the existence in 1964 of a state statutory policy to maintain segregation in restaurant facilities, petitioner relies principally on Miss. Code Ann. § 2046.5 (1956), which, on its face, "authorizes" and "empowers" owners of hotels, restaurants, and other places of public accommodation and amusement to refuse to serve whomsoever they choose.[2] The decision whether to serve a par-

---

[2] Section 2046.5 reads as follows:

"1. Every person, firm or corporation engaged in any public business, trade or profession of any kind whatsoever in the State of Mississippi, including, but not restricted to, hotels, motels, tourist courts, lodging houses, restaurants, dining room or lunch counters, barber shops, beauty parlors, theatres, moving picture shows, or other places of entertainment and amusement, including public parks and swimming pools, stores of any kind wherein merchandise is offered for sale, is hereby authorized and empowered to choose or select the person or persons he or it desires to do business with, and is further authorized and empowered to refuse to sell to, wait upon or serve any person that the owner, manager or employee of such public place of business does not desire to sell to, wait upon or serve . . . .

"2. Any public place of business may, if it so desires, display a sign posted in said place of business serving notice upon the general public that 'the management reserves the right to refuse to sell to, wait upon or serve any person,' however, the display

ticular individual is left to the unfettered discretion of the restaurant management, which may refuse service for any reason or for no reason. Thus, while there is no explicit command in § 2046.5 that segregated eating facilities be maintained, a refusal to serve on the basis of race alone falls clearly within the broad terms of the statute. The restaurateur is informed, in essence, that he may discriminate for racial or any other reasons and that he may call upon the police power of the State to make that private decision effective through the trespass sanctions expressly incorporated in § 2046.5. It is clear that, to the extent that the statute authorizes and empowers restaurateurs to discriminate on the basis of race, it cannot pass muster under the Fourteenth Amendment. *Burton* v. *Wilmington Parking Authority, supra,* at 726–727 (STEWART, J., concurring).

*Burton* involved a statute that permitted a restaurateur to refuse service to "persons whose reception or entertainment by him would be offensive to the major part of his customers . . . ." MR. JUSTICE STEWART took the position that the state courts had "construed this legislative enactment as authorizing discriminatory classification based exclusively on color." 365 U. S., at 726–727. Justices Frankfurter, HARLAN, and Whittaker, the only other Justices who dealt at length with the statute,[3]

---

of such a sign shall not be a prerequisite to exercising the authority conferred by this act.

"3. Any person who enters a public place of business in this state, or upon the premises thereof, and is requested or ordered to leave therefrom by the owner, manager or any employee thereof, and after having been so requested or ordered to leave, refuses so to do, shall be guilty of a trespass and upon conviction therefor shall be fined not more than five hundred dollars ($500.00) or imprisoned in jail not more than six (6) months, or both such fine and imprisonment. . . ."

[3] The Court found state action on a different ground.

agreed that it would violate the Fourteenth Amendment if so construed. However, they thought the construction adopted by the state courts insufficiently clear to make possible a final determination of the issue.

The language of § 2046.5 is considerably broader than that involved in *Burton*. Although § 2046.5 apparently has not been authoritatively interpreted by the state courts, its plain language clearly authorizes a restaurateur to refuse service for *any* reason, which obviously includes a refusal based upon race. Were there any conceivable doubt that § 2046.5 was intended to authorize, *inter alia,* "discriminatory classification based exclusively on color," it is completely dispelled by a consideration of the historical context in which § 2046.5 was enacted.

A legislative or constitutional provision need not be considered in isolation, but may be examined "in terms of its 'immediate objective,' its 'ultimate effect' and its 'historical context and the conditions existing prior to its enactment.'" *Reitman* v. *Mulkey, supra,* at 373; cf. *Lombard* v. *Louisiana, supra.* Through the 1950's and 1960's Mississippi had a "steel-hard, inflexible, undeviating official policy of segregation." *United States* v. *City of Jackson,* 318 F. 2d 1, 5 (C. A. 5th Cir. 1963) (Wisdom, J.). See generally J. Silver, Mississippi: The Closed Society (1964). Section 2046.5 itself was originally enacted in 1956 in the wake of our decisions in *Brown* v. *Board of Education,* 347 U. S. 483 (1954); 349 U. S. 294 (1955). It was passed contemporaneously with numerous statutes and resolutions condemning *Brown,*[4] requiring racial segregation in various transportation facilities,[5] and committing the state government to continued adherence to the principles of racial

---

[4] Miss. Laws 1956, c. 466, Senate Concurrent Resolution No. 125.

[5] *E. g.,* Miss. Laws 1956, cc. 258–260 [now Miss. Code Ann. §§ 7787.5, 2351.5, 2351.7].

segregation.[6]   Together with these other statutes and resolutions, § 2046.5 is indexed in the 1956 Mississippi Session Laws under "Segregation" and "Races."[7]   Prior

---

[6] *E. g.*, Miss. Laws 1956, c. 254 [now Miss. Code Ann. § 4065.3]. See Inaugural Address of former Governor James P. Coleman, Miss. House Journal 59, 65–68 (1956).   See also Miss. Code Ann. § 4065.4 (enacted 1962).

[7] The 1956 session of the Mississippi Legislature produced many statutes and resolutions, including § 2046.5, dealing with the separation of the races.   Under the heading "Segregation" in the index to the General Laws volume for that session, there is a cross-reference to "Races."   In addition to § 2046.5, Miss. Laws 1956, c. 257, the following chapters of the General Laws of Mississippi, all enacted during February, March, and April, 1956, are cited under that heading:

(1) Chapter 241 (maximum ten-year penalty for incestuous or interracial marriage);

(2) Chapter 253 [now Miss. Code Ann. §§ 2049–01 to 2049–08] (act "to prohibit the fomenting and agitation of litigation");

(3) Chapter 254 [now Miss. Code Ann. § 4065.3] ("entire executive branch" of state government "to prohibit by any lawful . . . means, the causing of a mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly");

(4) Chapter 255 [now Miss. Code Ann. § 8666] (standards for admitting foreign lawyers to practice in Mississippi);

(5) Chapter 256 [now Miss. Code Ann. § 2090.5] (act "to prohibit any person from creating a disturbance or breach of the peace in any public place of business");

(6) Chapter 258 [now Miss. Code Ann. § 7787.5] (act "to require railroad companies, bus companies and other common carriers of passengers owning, operating or leasing depots, bus stations or terminals to provide separate accomodations [*sic*] for the races traveling in intrastate travel");

(7) Chapter 259 [now Miss. Code Ann. § 2351.5] (act "to require railroad companies, bus companies or other common carriers for hire maintaining and operating waiting rooms for passengers to provide separate toilet facilities for the races traveling in intrastate travel");

(8) Chapter 260 [now Miss. Code Ann. § 2351.7] (act "to require all persons traveling in intrastate travel to use and occupy the waiting rooms marked and provided for such persons; to prohibit persons

to 1956, the State had declared unlawful any conspiracy "[t]o overthrow or violate the segregation laws of this state . . . ." [8] Subsequent to the passage of § 2046.5, breach of the peace, vagrancy, and trespass statutes similar to § 2046.5 [9] were enacted or employed to give local officials additional weapons to combat attempts to desegregate places of public accommodation. See, *e. g.*, *Dilworth* v. *Riner*, 343 F. 2d 226 (C. A. 5th Cir. 1965). [10]

Illustrative of the practical effect of these various provisions is the incident that gave rise to this liti-

---

traveling in intrastate travel from entering and using the waiting rooms not marked and provided for such persons");

(9) Chapter 261 (act "to prohibit the use of profane, vulgar, indecent, offensive, slanderous language over a telephone");

(10) Chapter 273 (separate schools to be maintained for white and black children) [see Miss. Code Ann. § 6220.5 (unlawful for whites to attend integrated schools)];

(11) Chapter 288 (repeal of compulsory education laws);

(12) Chapter 365 [now Miss. Code Ann. §§ 9028–31 to 9028–48] (creation of state sovereignty commission);

(13) Chapter 466 (Senate Concurrent Resolution No. 125 "condemning and protesting" *Brown* v. *Board of Education*).

In addition to the foregoing enactments of 1956, numerous other statutes, in force in 1956 and not thereafter repealed, manifest Mississippi's segregation policies. See, *e. g.*, Miss. Code Ann. § 2339 (punishment for those guilty of "printing, publishing or circulating . . . matter urging or presenting for public acceptance or general information, arguments or suggestions in favor of social equality or of intermarriage between whites and negroes"). Other provisions purport to require segregation in taxicabs (except for servants) (Miss. Code Ann. § 3499); in the State Insane Hospital (Miss. Code Ann. §§ 6882, 6883); and in schools (Miss. Const., Art. 8, § 207).

[8] Miss. Laws 1954, c. 20, Miss. Code Ann. § 2056. The explicit reference to segregation was omitted from the 1968 re-enactment of the conspiracy statute. Miss. Code Ann. § 2056 (Supp. 1968).

[9] *E. g.*, Miss. Code Ann. §§ 2087.5, 2087.7, 2089.5 (enacted 1960); § 2087.9 (enacted 1964).

[10] See generally *Bailey* v. *Patterson*, 323 F. 2d 201 (C. A. 5th Cir. 1963).

gation. Petitioner was arrested for vagrancy shortly after she had unsuccessfully sought service at respondent's store. In ordering dismissal of the charges after removal of the prosecutions to the federal courts, the Court of Appeals for the Fifth Circuit noted "[t]he utter baselessness of any conceivable contention that the vagrancy statutes prohibited any conduct in which these persons were engaged" and concluded that the arrests had been made solely because petitioner had attempted to receive service at a city library and at respondent's store in the company of Negro friends. *Achtenberg* v. *Mississippi,* 393 F. 2d 468, 474–475 (C. A. 5th Cir. 1968).[11]

In sum, it may be said of the various statutes and resolutions that constituted Mississippi's response to *Brown* that "they are bound together as the parts of a single plan. The plan may make the parts unlawful." *Swift & Co.* v. *United States,* 196 U. S. 375, 396 (1905) (Holmes, J.). Section 2046.5 was an integral part of this scheme to foster and encourage the practice of segregation in places of public accommodation and elsewhere, which it furthered by authorizing discrimination and by affording those who elected to discriminate on the basis of race a remedy under state law. Indeed, it is difficult to conceive of any purpose for the enactment of § 2046.5 other than to make clear the authorization of private discrimination where such express authorization did not exist previously. Cf. *Mulkey* v. *Reitman,* 64 Cal.

---

[11] Cf. *United States* v. *City of Jackson,* 318 F. 2d 1, 6–7 (C. A. 5th Cir. 1963), involving segregation in railroad and bus terminals, where the Court of Appeals noted that "one of the sophisticated methods for circumventing the law is for local police to eschew 'segregation' laws, using in their place conventional breach of peace or trespass laws as instruments for enforcing segregation, euphemistically termed 'separation.'" See also *Lewis* v. *Greyhound Corp.,* 199 F. Supp. 210 (D. C. M. D. Ala. 1961); *Bailey* v. *Patterson,* 199 F. Supp. 595, 609–622 (D. C. S. D. Miss. 1961) (Rives, J., dissenting), vacated and remanded, 369 U. S. 31 (1962).

2d 529, 544, 413 P. 2d 825, 835–836 (1966), aff'd, 387 U. S. 369 (1967).

Judge Waterman, dissenting in the Court of Appeals, states that under the common law an innkeeper, and by analogy a restaurateur, did not have the right to serve only whomever he wished and to discriminate on the basis of race in selecting his customers. 409 F. 2d 121, 131–133. See *Bell* v. *Maryland,* 378 U. S. 226, 296–300 (1964) (Goldberg, J., concurring). Since the common law is presumed to apply in Mississippi, *Western Union Telegraph Co.* v. *Goodman,* 166 Miss. 782, 146 So. 128 (1933), Judge Waterman concludes that the State has "drastically changed the common law" by enacting § 2046.5.[12] 409 F. 2d, at 132. Further support for this view can be found in the preamble to § 2046.5 which states that that provision "*confer[s]* upon any person . . . the further right to refuse to sell or render a service to any person . . . ." Miss. Laws 1956, c. 257. (Emphasis added.) This formulation suggests that the legislature intended to alter the existing state law.

It is not completely clear, however, that the common law in regard to innkeepers and restaurateurs, as understood by Judge Waterman, was ever widely enforced in Mississippi in racial matters. In Reconstruction times

---

[12] See *Donnell* v. *State,* 48 Miss. 661, 680–681 (1873):

"Among those customs which we call the common law, that have come down to us from the remote past, are rules which have a special application to those who sustain a *quasi* public relation to the community. The wayfarer and the traveler had a right to demand food and lodging from the inn-keeper; the common carrier was bound to accept all passengers and goods offered for transportation, according to his means. Soo, [*sic*] too, all who applied for admission to the public shows and amusements, were entitled to admission, and in each instance, for a refusal, an action on the case lay, unless sufficient reason were shown. The [state civil rights] statute deals with subjects which have always been under legal control."

the State enacted a civil rights law that forbade discrimination in places of public accommodation and amusement. See Miss. Laws 1873, c. LXIII. It was upheld and applied in *Donnell* v. *State,* 48 Miss. 661 (1873). That law, however, quickly fell into desuetude.[13] Thus some question exists as to whether Mississippi "changed" the law as it existed in that State in 1956. At least it can be said, however, that Mississippi, by enacting § 2046.5, clarified the state law, and in doing so elected to place the full authority of the State behind private acts of discrimination. Since § 2046.5 authorizes discrimination on the basis of race, it is invalid as applied to authorize such discrimination in particular cases..

The remaining question concerning this aspect of the present case is what nexus between § 2046.5 and respondent's alleged discrimination petitioner must show to establish that that discrimination is state action violative of the Fourteenth Amendment. Our prior decisions leave no doubt that the mere existence of efforts by the State, through legislation or otherwise, to authorize, encourage, or otherwise support racial discrimination in a particular facet of life constitutes illegal state involvement in those pertinent private acts of discrimination that subsequently occur. See, *e. g., Peterson* v. *City of Greenville, supra; Lombard* v. *Louisiana, supra; Robinson* v. *Florida,*

---

[13] The state civil rights law of 1873 took the form of an amendment to Miss. Rev. Code §§ 2731, 2732 (1871), which forbade, *inter alia,* segregation of the races on railroads, stage coaches, and steamboats. None of the provisions of the amended statutes, though apparently never explicitly repealed, appear in the 1880 Mississippi Code or in subsequent codifications of state law. In 1888 the Mississippi Legislature enacted a criminal statute that provided that "all railroads . . . shall provide equal but separate accommodations for the white and colored races" and that all prior statutes in conflict therewith were repealed *pro tanto.* Miss. Laws 1888, c. 27.

*supra.*[14]   This is so, as we noted in *Reitman* v. *Mulkey,*
*supra,* at 380, whether or not the private discriminator
was actually influenced in the commission of his act by
the policy of the State.   Thus, when private action con-
forms with state policy, it becomes a manifestation of
that policy and is thereby drawn within the ambit of
state action.   In sum, if an individual discriminates on
the basis of race and does so in conformity with the
State's policy to authorize or encourage such discrim-
ination, neither the State nor the private party will be
heard to say that their mutual involvement is outside
the prohibitions of the Fourteenth Amendment.   There-
fore, in light of the statutory scheme including § 2046.5,
which authorized and encouraged restaurant segregation,
petitioner will fully satisfy the state-action requirement
of the Fourteenth Amendment if she establishes that she
was refused service on the basis of race.

I turn now to the other elements of petitioner's case
under § 1983.

## II

Title 42 U. S. C. § 1983 derives from § 1 of the Civil
Rights Act of 1871, 17 Stat. 13, entitled, "An Act to en-
force the Provisions of the Fourteenth Amendment to the
Constitution of the United States, and for other Pur-
poses." [15]   The 1871 Act, popularly known as the "Ku

---

[14] Also see *McCabe* v. *Atchison, Topeka & Santa Fe R. Co.,*
235 U. S. 151 (1914); *Evans* v. *Abney,* 396 U. S. 435, 457–458
(1970) (BRENNAN, J., dissenting); *Evans* v. *Newton,* 382 U. S. 296,
302–312 (1966) (opinion of WHITE, J.); *Burton* v. *Wilmington Park-
ing Authority, supra,* at 726–727 (STEWART, J., concurring).  See
also *Mulkey* v. *Reitman, supra.*

[15] As originally enacted, § 1 of the 1871 Act provided:

"That any person who, under color of any law, statute, ordinance,
regulation, custom, or usage of any State, shall subject, or cause
to be subjected, any person within the jurisdiction of the United
States to the deprivation of any rights, privileges, or immunities

Klux Klan Act," was, as its legislative history makes absolutely clear, a response to the outrages committed by the Klan in many parts of the South. The conditions that gave rise to the Act were discussed extensively in *Monroe* v. *Pape,* 365 U. S. 167, 172–183 (1961). In the context of that case we pointed out that although the 1871 Act was engendered by the activities of the Klan, the language and purposes of § 1983 are not restricted to that evil. See 365 U. S., at 183. See also

secured by the Constitution of the United States, shall, any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled 'An act to protect all persons in the United States in their civil rights, and to furnish the means of their vindication'; and the other remedial laws of the United States which are in their nature applicable in such cases."

Section 1983 presently provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The language was changed without comment into its present form when § 1 was codified in 1874 as Revised Statutes § 1979. See *id.;* 1 Revision of U. S. Statutes, Draft 947 (1872). The jurisdictional provisions of the 1871 Act now appear in 28 U. S. C. § 1343. For purposes of this opinion I assume that the linguistic differences between the original § 1 and present § 1983 are immaterial. See *Monroe* v. *Pape,* 365 U. S. 167, 212–213, n. 18 (1961) (opinion of Frankfurter, J.); cf. *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 422–423, n. 29 (1968).

*United States* v. *Mosley,* 238 U. S. 383, 388 (1915), where Mr. Justice Holmes, speaking for the Court, commented on § 6 of the Enforcement Act of 1870, 16 Stat. 141, as amended, now 18 U. S. C. § 241, in words applicable to § 1983:

> "Just as the Fourteenth Amendment . . . was adopted with a view to the protection of the colored race but has been found to be equally important in its application to the rights of all, [the statute] had a general scope and used general words that have become the most important now that the Ku Klux have passed away. . . . [W]e cannot allow the past so far to affect the present as to deprive citizens of the United States of the general protection which on its face [the statute] most reasonably affords."

Stirred to action by the wholesale breakdown of protection of civil rights in the South, Congress carried to completion the creation of a comprehensive scheme of remedies—civil, criminal, and military [16]—for the protection of constitutional rights from all major interference.

In the 1871 Act, Congress undertook to provide broad federal civil remedies against interference with the exercise and actual enjoyment of constitutional rights, particularly the right to equal protection. Section 1 (now § 1983) provided a civil remedy for deprivation of any constitutional right by a person acting "under color of any law, statute, ordinance, regulation, custom, or usage of any State . . . ." Section 2 (now surviving

---

[16] The military remedy, designed to become available when the other remedies were inadequate, was created by § 3 of the 1871 Act, now 10 U. S. C. § 333. See generally Comment, Federal Intervention in the States for the Suppression of Domestic Violence: Constitutionality, Statutory Power, and Policy, 1966 Duke L. J. 415.

in part as § 1985 (3)) provided a civil and a criminal remedy against conspiratorial interference with any person's enjoyment of equal protection. Section 6 (now § 1986) cast the net of civil liability even more widely by providing a remedy against any person who, having the ability by reasonable diligence to prevent a violation of § 2, fails to do so. These remedies were bolstered by other criminal provisions of § 2 and by previously enacted criminal laws. Section 2 of the Civil Rights Act of 1866, 14 Stat. 27, re-enacted as § 17 of the Enforcement Act of 1870, 16 Stat. 144, as amended, now 18 U. S. C. § 242, provided a criminal remedy against what amounts to a violation of § 1983. Section 6 of the Enforcement Act of 1870, 16 Stat. 141, as amended, now 18 U. S. C. § 241, provided a criminal remedy against conspiracies to interfere with the exercise or enjoyment of a federal right.[17]

The history of this scheme of remedies for the protection of civil rights was, until very recently, one of virtual nullification by this Court. Key provisions were declared unconstitutional or given an unduly narrow construction wholly out of keeping with their purposes.[18] In *United States* v. *Harris,* 106 U. S. 629 (1883), the Court invalidated the criminal provision of § 2 of the

---

[17] Numerous other criminal and civil remedies had been created by prior civil rights acts, principally to protect voting rights. See § 6 of the 1866 Act, 14 Stat. 28; §§ 2, 3, 4, 5, 7, 11, 15, 19, 20, and 22 of the 1870 Act, 16 Stat. 140 *et seq.;* §§ 1, 10, and 11 of the Act of Feb. 28, 1871, 16 Stat. 433, 436, 437. All of these statutes have been repealed, see 28 Stat. 36 (1894); 35 Stat. 1088, 1153 (1909), some after having been declared unconstitutional. See, *e. g., United States* v. *Reese,* 92 U. S. 214 (1876) (§§ 3, 4 of 1870 Act held unconstitutional); *James* v. *Bowman,* 190 U. S. 127 (1903) (§ 5 of 1870 Act held unconstitutional).

[18] See generally Gressman, The Unhappy History of Civil Rights Legislation, 50 Mich. L. Rev. 1323 (1952).

Ku Klux Klan Act, the criminal analogue to § 1985 (3), on the ground that Congress was not authorized by § 5 of the Fourteenth Amendment to prohibit interference by private persons with the exercise of Fourteenth Amendment rights, except perhaps in extreme and remote circumstances. Essential to the holding was a recognition that the language of § 2 plainly reaches conspiracies not involving state officials. See also *Baldwin* v. *Franks,* 120 U. S. 678 (1887). The statute (Rev. Stat. § 5519) was repealed in 1909. 35 Stat. 1154. In *Collins* v. *Hardyman,* 341 U. S. 651 (1951), the Court, under the influence of *Harris,* construed § 1985 (3). Pointing out that the language of § 1985 (3) is exactly the same (except for the remedy provided) as the language of the statute condemned in *Harris,* the Court thought it necessary to read in a limitation of the section to conspiracies involving state action, in order to sustain its constitutionality. This limiting construction necessarily carried over to § 1986, whose scope is keyed to that of § 1985.

Section 241 of 18 U. S. C. fared little better. That statute, as indicated, deals generally with conspiracies to interfere with the exercise of federal rights. It was established soon after its enactment that § 241 reaches conspiracies among private persons to interfere with "rights which arise from the relationship of the individual and the Federal Government." *United States* v. *Williams,* 341 U. S. 70, 77 (1951) (opinion of Frankfurter, J.). See, e. g., *Ex parte Yarbrough,* 110 U. S. 651 (1884); *United States* v. *Waddell,* 112 U. S. 76 (1884); *Logan* v. *United States,* 144 U. S. 263 (1892); *In re Quarles,* 158 U. S. 532 (1895). However, the concept of "arising from" was given a very narrow construction in *United States* v. *Cruikshank,* 92 U. S. 542 (1876). Moreover, in *United States* v. *Williams, supra,* the Court divided 4 to 4 on the question whether § 241 reaches private conspiracies to

interfere with the exercise of Fourteenth Amendment rights, which arise from the relation of an individual and a State. The four members of the Court who thought § 241 does not protect the exercise of Fourteenth Amendment rights placed considerable reliance on the argument that § 241 would be unconstitutional if construed otherwise. See 341 U. S., at 77–78. See also *Hodges* v. *United States,* 203 U. S. 1 (1906).

Although the other principal criminal statute protecting civil rights, 18 U. S. C. § 242, the criminal analogue to § 1983, was construed to protect Fourteenth Amendment rights, it was nonetheless held constitutional. However, under this statute a violation can be found only if the defendant acted "willfully," that is, with "a specific intent to deprive a person of a federal right made definite by decision or other rule of law." See *Screws* v. *United States,* 325 U. S. 91, 103 (1945). Moreover, this Court has never had occasion to consider whether § 242 reaches wholly nonofficial conduct.

Thus, until very recently, the construction of the surviving remedial civil rights statutes was narrowed or placed in doubt by a restrictive view of the power of Congress under § 5 of the Fourteenth Amendment. But that view of congressional power has now been completely rejected by this Court.

In *United States* v. *Guest,* 383 U. S. 745 (1966), and *United States* v. *Price,* 383 U. S. 787 (1966), the Court expressly held that § 241 does protect Fourteenth Amendment rights, thereby squarely resolving the issue that divided the court in *Williams.* Because the conspiracy in *Guest* was alleged to have been carried out by private persons acting in conjunction with state officials,[19] the Court found it unnecessary to consider whether § 241

---

[19] *Guest* was an appeal from the dismissal of an indictment for failure to state an offense under the laws of the United States.

would be constitutional if construed to reach wholly private conspiracies to interfere with the exercise of Fourteenth Amendment rights. However, to put the point beyond doubt, six members of the Court in *Guest* expressly stated their view that Congress has power under § 5 of the Fourteenth Amendment to protect Fourteenth Amendment rights against interference by private persons, without regard to state involvement in the private interference. See *United States* v. *Guest, supra,* at 761–762 (opinion of Clark, J., joined by BLACK and Fortas, JJ.), 774–786 (opinion of BRENNAN, J., joined by Warren, C. J., and DOUGLAS, J.). This general view of congressional power under § 5 was expressly adopted by the Court in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), where we said:

> "By including § 5 the draftsmen sought to grant to Congress, by a specific provision applicable to the Fourteenth Amendment, the same broad powers expressed in the Necessary and Proper Clause, Art. I, § 8, cl. 18. . . . Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." 384 U. S., at 650–651.

See also *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966).[20]

Thus the holding of *Harris* and the *Civil Rights Cases,* 109 U. S. 3 (1883), that Congress cannot under § 5 protect the exercise of Fourteenth Amendment rights from private interference has been overruled. See *United States* v. *Guest, supra,* at 782–783 (opinion of BREN-

---

[20] See generally Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv. L. Rev. 91 (1966).

NAN, J.). Consequently, the interpretation of the civil rights statutes need no longer be warped by unwarranted concern that Congress lacks power under § 5 to reach conduct by persons other than public officials. There is no doubt that § 1983 protects Fourteenth Amendment rights. See *Monroe* v. *Pape, supra,* at 170–171; *id.,* at 205–206 (opinion of Frankfurter, J.). Accordingly, the only substantial question in this branch of the present case is whether § 1983 was intended by Congress to reach nonofficial conduct of the kind at issue here.

Petitioner contends that respondent's discrimination against her was within the scope of § 1983 on either of two grounds. First, she claims that respondent acted under color of Mississippi statutory law, and in particular Mississippi Code § 2046.5. Second, she claims that respondent acted under color of a custom or usage of Mississippi, which prescribed segregation of the races in dining facilities.

Petitioner's claim that respondent acted under color of Mississippi statutory law is similar to her claim that respondent's action constituted state action. Indeed, the two claims would be proved by the same factual showing if respondent were a state official who acted by virtue of his official capacity or a private party acting in conjunction with such state official, for when a state official acts by virtue of his official capacity it is precisely the use or misuse of state authority that makes the action state action. However, when a private party acts alone,[21] more must be shown, in my view, to establish that he acts "under color of" a state statute or other authority than is needed to show that his action constitutes state action.

_____

[21] For purposes of this part of the opinion I put aside petitioner's allegation of a conspiracy.

As I pointed out in Part I, *supra,* under the constitutional principle that no State shall have any significant involvement whatever in racial discrimination, and under our prior cases, the mere existence of a state policy authorizing, encouraging, or otherwise supporting racial discrimination in a particular kind of service is sufficient to render private discrimination in that service state action. However, the statutory term "under color of any statute" has a narrower meaning than the constitutional concept of "state action." The "under color" language of § 1983 serves generally to limit the kinds of constitutional violation for which the section provides a remedy. To understand how that language applies to private persons, it is helpful to consider its application to state officials. In other legal usage, the word "color," as in "color of authority," "color of law," "color of office," "color of title," and "colorable," suggests a kind of holding out and means "appearance, semblance, or *simulacrum,*" but not necessarily the reality. See H. Black, Law Dictionary 331–332 (rev. 4th ed. 1968). However, as the word appears in § 1983, it covers both actions actually authorized by a State, see *Myers* v. *Anderson,* 238 U. S. 368 (1915); *Nixon* v. *Herndon,* 273 U. S. 536 (1927); *Lane* v. *Wilson,* 307 U. S. 268 (1939), and misuse of state authority in ways not intended by the State, see, *e. g., Monroe* v. *Pape, supra; Screws* v. *United States, supra,* at 111. In some of these latter situations there is a holding out in that the official uses his actual authority to give the appearance that he has authority to take the particular action he is taking. In other cases the abuse of power is so palpable that the victim or any observer may well be aware that the official is exceeding his authority, so that any holding out of authority would be wholly transparent. In these cases the misuse of authority alone is enough to warrant recovery. See, *e. g., Monroe* v. *Pape, supra;*

*United States* v. *Classic,* 313 U. S. 299, 326 (1941);
*Catlette* v. *United States,* 132 F. 2d 902 (C. A. 4th Cir.
1943). Thus, a public official acting by virtue of his official capacity always acts under color of a state statute or
other law, whether or not he overtly relies on that
authority to support his action, and whether or not that
action violates state law. A private person acts "under color of" a state statute or other law when he,
like the official, in some way acts consciously pursuant
to some law that gives him aid, comfort, or incentive,
cf. *Griffin* v. *Maryland,* 378 U. S. 130 (1964); *Flemming*
v. *South Carolina Elec. & Gas Co.,* 224 F. 2d 752 (C. A.
4th Cir. 1955), appeal dismissed, 351 U. S. 901 (1956);
or when he acts in conjunction with a state official, as in
*United States* v. *Price, supra.* In the present case Mississippi statutory law did authorize and encourage respondent to discriminate against petitioner on the basis
of race. Therefore petitioner can establish that respondent acted "under color of" Mississippi statutory law by
showing that respondent was aware of that body of law
as prescribing, encouraging, authorizing, legitimating,
effectuating, or otherwise supporting its refusal to serve
petitioner. The vice of action under color of statute
exists wherever the private discriminator consciously
draws from a state statute any kind of support for his
discrimination. Therefore, it is irrelevant that petitioner
was not arrested under the trespass provision of § 2046.5.

Petitioner's second contention, that respondent discriminated against her "under color of [a] custom, or
usage" of Mississippi, presents more difficulty. I have
found few prior cases construing the phrase "under color
of custom, or usage" in the context of § 1983; [22] and it

---

[22] Mr. Justice Frankfurter made a passing reference to "custom" in
his separate opinion in *Monroe* v. *Pape, supra,* at 246; see *infra,* at
216, n. 25. In the lower courts the phrase "custom or usage" has not
received thorough consideration and has been given different inter-

has not been litigated under 18 U. S. C. § 242, though in that context it was briefly discussed in the opinions in *Jones* v. *Alfred H. Mayer Co., supra.* It is true that on occasion this Court has summed up the statutory language "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" as meaning "under color of law," and as incorporating a requirement of state action akin to that of the Equal Protection Clause. See, *e. g., United States* v. *Price, supra,* at 794 n. 7. But the loose and vague phrase "under color of law" has always been used by the Court in the context of cases in which reliance was put on something other than "custom or usage." The Court

pretations. Compare *Williams* v. *Hot Shoppes, Inc.,* 110 U. S. App. D. C. 358, 363–364, 293 F. 2d 835, 840–841 (1961) with *Gannon* v. *Action,* 303 F. Supp. 1240 (D. C. E. D. Mo. 1969). In the *Hot Shoppes* case, the court construed "custom or usage" to include a state-action requirement; but it did so solely on the basis of doubts about congressional power to reach private interference with Fourteenth Amendment rights. Those doubts have now been completely removed by decisions of this Court. See *supra,* at 208–210. In two other cases, *Williams* v. *Howard Johnson's Restaurant,* 268 F. 2d 845 (C. A. 4th Cir. 1959), and *Williams* v. *Howard Johnson's, Inc.,* 323 F. 2d 102 (C. A. 4th Cir. 1963), on subsequent appeal *sub nom. Williams* v. *Lewis,* 342 F. 2d 727 (C. A. 4th Cir. 1965) (*en banc*), the Court of Appeals for the Fourth Circuit held that private custom and usage did not amount to state action. In each case the court dealt with custom and usage under the first element of § 1983— deprivation of a constitutional right—and not under the second element—action under color of statute, ordinance, regulation, custom, or usage. Those two decisions were constructions of the Equal Protection Clause, not of § 1983. The same is true of *Slack* v. *Atlantic White Tower System,* 181 F. Supp. 124 (D. C. Md.), aff'd, 284 F. 2d 746 (C. A. 4th Cir. 1960), cited by the Court. Moreover, in that case the court had no occasion to consider the elements of a § 1983 custom, because it took judicial notice of reports showing that in the defendant's area there was in fact no custom of restaurant segregation in any sense. See 181 F. Supp., at 126.

has never held, or even intimated, that "custom or usage" means "law." Indeed, MR. JUSTICE HARLAN, dissenting in *Jones* v. *Alfred H. Mayer Co., supra,* used a different formula in summarizing the "under color of" language in § 242; he said it referred to "action taken pursuant to *state or community authority.*" 392 U. S., at 454. Moreover, he referred to "discriminations which were legitimated by a *state or community sanction* sufficiently powerful to deserve the name 'custom.'" *Id.,* at 457. (Emphasis added.) See also *Monroe* v. *Pape, supra,* at 193 (HARLAN, J., concurring) ("abuses so recurrent as to amount to 'custom, or usage'"). Thus, "under color of law" has not been the only formula used by members of this Court to summarize the parallel language in §§ 242 and 1983.[23] It is also true that the phrase "under color

---

[23] As presently codified, § 242 begins:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . ."

This language differs from the comparable language of § 1983, n. 15, *supra,* in several respects. For example: "law" precedes "statute" in § 242, but not in § 1983; "or usage" follows "custom" in § 1983, but not in § 242; the entire enumeration "statute . . . usage" is qualified by "of any State or Territory" in § 1983, but not in § 242; § 1983 refers to rights that are "secured," whereas § 242 refers to rights "secured or protected"; § 1983 covers rights secured "by the Constitution *and* laws" (emphasis added), whereas § 242 covers rights secured or protected "by the Constitution *or* laws of the United States" (emphasis added); § 242 reaches only acts done "willfully," but § 1983 is not so limited. As originally enacted, § 1983 was modeled on the precursor of § 242, with differences of coverage not material here. See Cong. Globe, 42d Cong., 1st Sess., App. 68 (remarks of Rep. Shellabarger). Apart from the inclusion of the word "willfully" in § 242, see *Monroe* v. *Pape, supra,* at 187, the linguistic differences mentioned here have not been thought to be substantive. See, *e. g., id.,* at 185; *id.,* at 212–213, n. 18 (opinion of Frankfurter, J.); *United States* v. *Price, supra,* at 794 n. 7.

of law" occurs in the debates on the 1871 Act, see n. 25, *infra.* But since in the original version of § 1983, as introduced and enacted, the word "law" was the first word in the enumeration following "color of," [24] the use of "under color of law" as a handy formula in debate is readily explained. More importantly, the phrase has never been taken to be a considered, comprehensive, and authoritative summation of the provisions of § 1983. As this Court said over a century ago and has since repeated, "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States* v. *Boisdoré's Heirs,* 8 How. 113, 122 (1849) (Taney, C. J.); *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 285 (1956); *Richards* v. *United States,* 369 U. S. 1, 11 (1962); *Dandridge* v. *Williams,* 397 U. S. 471, 517 (1970) (MARSHALL, J., dissenting).

The legislative history of § 1983 provides no direct guidance for the interpretation of the phrase "custom or usage." Much of the lengthy debate concerned the truth of the allegations of KKK outrages and the constitutionality and wisdom of other sections of the Act. Little attention was given to the precise wording of § 1983, and there was no sustained discussion of the meaning of "custom or usage." [25] Consequently, in my

---

[24] See n. 15, *supra.*

[25] The legislative history concerning the precise congressional understanding of "custom or usage" is inconclusive. At least four possible interpretations were suggested. Representative Blair, an opponent of the bill, argued that § 1983 operated only against state legislation and as such would be a nullity. See Cong. Globe, 42d Cong., 1st Sess., App. 209; see also *id.,* at App. 268 (remarks of Rep. Sloss, an opponent). Our cases squarely reject any such limited construction of § 1983. See, *e. g., Monroe* v. *Pape, supra.* A second view was that § 1983 reached deprivations of constitutional rights under "color of law." See, *e. g., id.,* at App. 68 (remarks of Rep. Shellabarger); *id.,* at 568 (remarks of Sen. Edmunds); but see *id.,* at 697–698 (remarks of Sen. Edmunds). Since Representa-

view, we are called on to analyze the purposes Congress sought to achieve by enacting § 1983 in the context of the Civil Rights Act of 1871. Only by relating the

---

tive Shellabarger and Senator Edmunds were the managers of the bill, their commentary would ordinarily be entitled to great weight; but at no point did either explain what he meant by "color of law." Representative Kerr, an opponent, employed the formula "color of state laws," but predicted that § 1983 would give rise to a flood of litigation involving all types of injury to person or property. See *id.*, at App. 50. A third view was reflected in the comment of Senator Thurman, an opponent, who said in passing that § 1983 "refers to a deprivation under color of law, either statute law or 'custom or usage' which has become common law." *Id.*, at App. 217. There is little or no further support in the debate for this reading of the statute, though it apparently was adopted without discussion by Mr. Justice Frankfurter, see *Monroe* v. *Pape, supra,* at 246 (opinion of Frankfurter, J.). The precise meaning of Senator Thurman's formula is unclear. He may have been referring to customs that had been expressly recognized and approved by state courts, or he may have had in mind the ancient principle that a general custom as such "is really a part of the common law itself." *Louisville & Nashville R. Co.* v. *Reverman,* 243 Ky. 702, 707, 49 S. W. 2d 558, 560 (1932). See 1 W. Blackstone, Commentaries \*\*68–74. Moreover, Senator Thurman joined several others in taking a fourth position: that § 1983 reaches private persons. See *id.*, at App. 216–217 (remarks of Sen. Thurman); *id.*, at App. 215 (remarks of Sen. Johnston, an opponent); *id.*, at 429 (remarks of Rep. McHenry, an opponent); *id.*, at 395 (remarks of Rep. Rice, an opponent); cf. *id.*, at 804 (remarks of Rep. Poland, a supporter and conferee). Other speeches during the debate and consideration of the purposes of the statute make it clear that Congress did not intend to reach every private interference with a constitutional right. See *infra*, at 219–220. Finally, two members of the House expressed a view compatible with any of the preceding positions: they thought the principal effect of § 1983 was to remove the possible defense that the defendant acted under state authority. See *id.*, at 416 (remarks of Rep. Biggs, an opponent); *id.*, at App. 310 (remarks of Rep. Maynard, a supporter).

Section 1983 was patterned after § 2 of the Civil Rights Act of 1866, 14 Stat. 27. See Cong. Globe, 42d Cong., 1st Sess., App. 68 (remarks of Rep. Shellabarger). The legislative history of the latter

phrase "custom or usage" to congressional purposes can we properly interpret and apply the statutory language today.

In seeking to determine the purposes of § 1983, it is important to recall that it originated as part of a statute directed against the depredations of a private army. Cong. Globe, 42d Cong., 1st Sess., 339 (remarks of Rep. Kelley, a supporter of the bill). The Klan was recognized by Congress to be a widespread conspiracy "operating wholly outside the law," *Jones* v. *Alfred H. Mayer Co., supra,* at 436, and employing a variety of methods to coerce Negroes and others to forgo exercise of civil rights theoretically protected by the Constitution and federal statutes. In some areas of the South the Klan was strong enough to paralyze the operations of state government. As Representative Coburn, a supporter of the bill, noted:

> "Such, then, is the character of these outrages—numerous, repeated, continued from month to month and year to year, extending over many States; all similar in their character, aimed at a similar class of citizens; all palliated or excused or

section is no more enlightening on the precise meaning of "under color of any law, statute, ordinance, regulation, or custom" than are the comments on the similar language in § 1983. See Cong. Globe, 39th Cong., 1st Sess., 1680 (veto message of President Johnson); *id.,* at 1120 (remarks of Rep. Loan, a supporter, and Rep. J. Wilson, a manager); *id.,* at 1778 (remarks of Sen. Johnson, an opponent); *id.,* at 1785 (remarks of Sen. Stewart, a supporter); *id.,* at 475, 500, 1758 (remarks of Sen. Trumbull, a manager).

Similar language appeared in § 8 of the Freedmen's Bureau bill, which was also debated at the first session of the 39th Congress. In addition, the word "custom" appeared in § 7 of the bill. See *id.,* at 209. However, the precise language of both sections received virtually no attention during debate. There was, though, some indication that custom was recognized as different from law. See *id.,* at 318 (remarks of Sen. Hendricks, an opponent). See also n. 29, *infra.*

justified or absolutely denied by the same class of men. Not like the local outbreaks sometimes appearing in particular districts, where a mob or a band of regulators may for a time commit crimes and defy the law, but having every mark and attribute of a systematic, persistent, well-defined organization, with a fixed purpose, with a regular plan of action.

"The development of this condition of affairs was not the work of a day or even of a year. It could not be, in the nature of things; it must be slow; one fact to be piled on another, week after week, year after year. . . .

"Such occurrences show that there is a pre-concerted and effective plan by which thousands of men are deprived of the equal protection of the laws. The arresting power is fettered, the witnesses are silenced, the courts are impotent, the laws are annulled, the criminal goes free, the persecuted citizen looks in vain for redress. This condition of affairs extends to counties and States; it is, in many places, the rule, and not the exception." Cong. Globe, 42d Cong., 1st Sess., 458–459.

See also *id.,* at App. 172 (remarks of Sen. Pool, a supporter); *id.,* at 653 (remarks of Sen. Osborn, a supporter); *id.,* at 155–160 (remarks of Sen. Sherman, a supporter). Thus the mischief that the legislation of 1871 was intended to remedy derived, not from state action, but from concerted "private" action that the States were unwilling or unable to cope with.

Senator Schurz, a moderate opponent who on behalf of the President had personally investigated the disorders in the South, summed up the condition to be dealt with:

"The real evil in the southern States you will find in the baffled pro-slavery tendency prevailing there;

in a diseased public sentiment which partly vents itself in violent acts, partly winks at them, and partly permits itself to be overawed by them. That public sentiment is not only terrorizing timid people, but it is corrupting the jury-box, it is overawing the witness-stand, and it is thus obstructing the functions of justice." *Id.*, at 687.

Representative [later President] Garfield, a moderate supporter, focused more specifically on one of the principal evils § 1983 was designed to remedy:

"[T]he chief complaint is not that the laws of the State are unequal, but that even where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under them." *Id.*, at App. 153.

Accordingly, in his view, § 1983 was intended to provide a remedy in federal court for, *inter alia*, certain denials of equal protection that occurred even in States with just and equal laws when some private persons acted against others and the State failed to provide protection. Thus, both the House and the Senate were quite aware that the task before them was to devise a scheme of remedies against privately instigated interference with the exercise of constitutional rights, through terror, force of numbers, concerted action, and other means.

The debates in both Houses also make it clear that many of those who gave the most careful attention to the conditions that called for the bill, to the provisions of the bill itself, and to the problems of constitutionality and policy it presented, did not think that in § 1983 the Federal Government undertook to provide a federal remedy for every isolated act by private persons that

amounted to interference with the exercise of a constitutional right. See, *e. g., id.*, at 578–579 (remarks of Sen. Trumbull, an opponent); *id.*, at 514 (remarks of Rep. Poland, a supporter and conferee); *id.*, at App. 153 (remarks of Rep. Garfield); *id.*, at App. 79 (remarks of Rep. A. Perry, a supporter).[26] Where, for example, the injury to federal rights was the result of a genuinely individual act of private prejudice, then it could not be said that the state and local authorities were failing to give equal protection by countenancing major interference with the exercise of federal rights. Indeed, in most instances it could rightly be said that the acts of discrimination were isolated precisely because the State was affirmatively fulfilling its obligation to afford equal protection. In such circumstances no useful purpose would be served by providing a federal remedy for the isolated wrong, and the resulting federal intrusion into state affairs would be unjustified.

Near the conclusion of the debate, Rep. Garfield observed:

> "I believe, Mr. Speaker, that we have at last secured a bill, trenchant in its provisions, that reaches down into the very heart of the Ku Klux organization, and yet is so guarded as to preserve intact the autonomy of the States, the machinery of the State governments, and the municipal organizations established under State laws." *Id.*, at 808.

This statute, "trenchant" but measured, provided a scheme of three civil remedies, currently codified in §§ 1983, 1985, and 1986. In view of the purposes these remedies were designed to achieve, § 1983 would be read too narrowly if it were restricted to acts of state officials and those acting in concert with them. Congress did not say, "Every state official and others acting

---

[26] See generally R. Harris, The Quest for Equality 44–50 (1960).

in concert with him . . ."; Congress said, "[*A*]*ny* [now *Every*] *person* who, under color . . ." (emphasis added). Similarly, it would be read too broadly if interpreted to reach acts of purely individual discrimination. As I read § 1983 together with the other sections, against the background of the congressional debates, I understand them to protect the exercise of constitutional rights by reaching three kinds of interference that are sufficiently "major" in their effects to have warranted congressional action.

The first category is that involving action under color of authority derived from state government and this category of invasions is clearly within § 1983. Where state officials or private persons acting consciously with state support participate in the interference with the exercise of federal rights, the interference assumes a far graver cast than it otherwise would have, and the authority of the State is brought into conflict with the authority of the Constitution. See, *e. g., Monroe* v. *Pape, supra,* at 238 (opinion of Frankfurter, J.).

The second category is that involving conspiracy, which is within the ambit of § 1985. It is well recognized in the criminal law that conspiratorial agreements for concerted action present aggravated dangers to society, see *United States* v. *Rabinowich,* 238 U. S. 78, 88 (1915); *Pinkerton* v. *United States,* 328 U. S. 640, 644 (1946); *Krulewitch* v. *United States,* 336 U. S. 440, 448–449 (1949) (Jackson, J., concurring); Note, Developments in the Law—Criminal Conspiracy, 72 Harv. L. Rev. 920, 923–924 (1959), and for this general reason, as exemplified in the activities of the Ku Klux Klan, Congress provided for a civil remedy against conspiratorial interference with the right to equal protection.[27]

---

[27] I consider the narrow construction given to § 1985 in *Collins* v. *Hardyman,* 341 U. S. 651 (1951), as no longer binding. See *supra,* at 206–210.

The third category is that where, in the absence of the overt elements of a conspiracy, constitutional rights are violated by widespread habitual practices or conventions regarded as prescribing norms for conduct, and supported by common consent, or official or unofficial community sanctions—in short, customs and usages. Where violation of constitutional rights is customary, the violation is, by definition, widespread and enduring, and therefore worthy of congressional response. As I read § 1983, that response was made in the provision of a remedy against

> "[e]very person who, under color of any . . . custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." [28]

The excerpts from the congressional debate that I have quoted make clear that Congress wanted a civil remedy, not only against conspiratorial violence, but also against the perhaps more subtle but potentially more virulent customary infringements of constitutional rights. The Ku Klux Klan was an extreme reflection of broadly held attitudes toward Negroes and longstanding practices of denying them rights that the Constitution secured for all people. The fundamental evil was a "diseased public sentiment" reflected in multifarious efforts to confine Negroes in their former status of inferiority. Accordingly, a statute designed to reach "down into the very heart of the Ku Klux organization" had to deal with the widespread manifestations of that diseased pub-

---

[28] Section 1986 fits into this legislative scheme by providing a remedy against individuals who share responsibility for conspiratorial wrongs under § 1985 by failing to make reasonable use of their power to prevent the perpetration of such wrongs.

lic sentiment. Respect for constitutional rights was to be "embodied not only in the laws, but intrenched in the daily habits of the American people . . . ." Cong. Globe, 42d Cong., 1st Sess., 339 (remarks of Rep. Kelley). Congress could not legislate popular sentiments, but in providing generally in the Ku Klux Klan Act for the protection of constitutional rights against major types of interference it could, and I think it did in § 1983, provide a remedy against violations that in particular States were so common as to be customary.

As this Court recently said in construing another of the early civil rights statutes, "We think that history leaves no doubt that, if we are to give [the statute] the scope that its origins dictate, we must accord it a sweep as broad as its language." *United States* v. *Price, supra,* at 801. The language of § 1983 imposes no obstacle to an interpretation carrying out the congressional purposes I have identified. I think it clearly possible for a private person or entity like respondent to "subject" a person or "[cause him] to be subjected . . . to the deprivation" of a constitutional right, as those quoted words are used in § 1983. In *Monroe* v. *Pape, supra,* we held that a cause of action was stated under § 1983 by an allegation that police officers invaded petitioners' home in violation of the Fourth and Fourteenth Amendments. Certainly if "deprivation" in § 1983 means something like "extinguishment," then no cause of action could have been stated, for no policeman, nor even any state government as a whole, can extinguish a constitutional right, at least not while this Court sits. Cf. *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 223 (Holmes, J., dissenting).[29] A con-

---

[29] I think this is also an adequate answer to the argument made in the *Civil Rights Cases, supra,* at 17, that a private party differs from a State in that the former cannot, whereas the latter can, deprive a person of a constitutional right in the sense of extinguishing that right. Neither a private person nor a State can extinguish

stitutional right can be extinguished only by amendment of the Constitution itself. If "deprivation" meant "extinguishment," § 1983—and also 18 U. S. C. § 242—would be a nullity. Thus all the cases finding violations of these sections must be taken to have held that "deprivation" as used in these statutes means, not "extinguishment," but rather something like "violation," "denial," or "infringement." Cf. *Jones* v. *Alfred H. Mayer Co., supra,* at 420–421; Cong. Globe, 39th Cong., 1st Sess., 605 (remarks of Sen. Trumbull, manager of 1866 Civil Rights bill, on § 242). As the present case illustrates, it is possible for private action in some circumstances to constitute state action violating a constitutional right, and such action amounts to "deprivation" within the meaning of § 1983.

In discussing petitioner's contention that respondent acted under color of state law I have already indicated my understanding of the words "under color of." See *supra,* at 211–212. I would apply that understanding here as well. I read "custom, or usage" in § 1983 to mean what it has usually meant at common law—a widespread and longstanding practice, commonly regarded as prescribing norms for conduct, and backed by sanctions.

---

or impair a constitutional right, although a State can certainly violate, infringe, or fail to protect a constitutional right. A private person can· violate or infringe a constitutional right when, due to some factual circumstances, his action constitutes state action, or when his wholly private conduct violates some constitutional prohibition of such conduct, *e. g.,* § 1 of the Thirteenth Amendment. Cf. *Civil Rights Cases, supra,* at 20; *Clyatt* v. *United States,* 197 U. S. 207, 216 (1905); *Bailey* v. *Alabama,* 219 U. S. 219, 241 (1911). A private person can also, of course, by wholly private conduct interfere with the exercise or enjoyment of constitutional rights that run only against the States. *United States* v. *Guest, supra,* at 774–784 (opinion of BRENNAN, J.). Thus interference can occur even where there has been no violation of the constitutional right by a party having a duty correlative to it.

See, *e. g., Strother* v. *Lucas,* 12 Pet. 410, 437, 445–446 (1838); *United States* v. *Arredondo,* 6 Pet. 691, 713–714 (1832). The sanctions need not be imposed by the State. A custom can *have* the effect or force of law even where it is not *backed by* the force of the State. See, *e. g., Adams* v. *Otterback,* 15 How. 539, 545 (1854); *Merchants' Bank* v. *State Bank,* 10 Wall. 604, 651 (1871); cf. *Jones* v. *Alfred H. Mayer Co., supra,* at 423.[30] The power of custom to generate and impose rules of conduct, even without the support of the State, has long been recognized. See, *e. g., Mercer County* v. *Hacket,* 1 Wall. 83, 95 (1864); 1 W. Blackstone, Commentaries *64; B. Cardozo, The Nature of the Judicial Process 58–64 (1921).[31]

---

[30] In *Jones* v. *Alfred H. Mayer Co., supra,* at 423 n. 30, the Court noted that the same session of Congress that passed the Civil Rights Act of 1866 also passed a Freedmen's Bureau bill, § 7 of which extended military jurisdiction over parts of the South where "in consequence of any State or local law, ordinance, police, or other regulation, custom, or prejudice, any of the civil rights . . . belonging to white persons . . . are refused or denied to [N]egroes . . . on account of race, color, or any previous condition of slavery or involuntary servitude . . . ." See Cong. Globe, 39th Cong., 1st Sess., 209, 318. The Court pointed out that although the bill was vetoed by President Johnson, it "was nonetheless significant for its recognition that the 'right to purchase [property]' was a right that could be 'refused or denied' by 'custom or prejudice' as well as by 'State or local law.'" The Court also observed: "Of course an 'abrogation of civil rights made "in consequence of . . . custom, or prejudice" might as easily be perpetrated by private individuals or by unofficial community activity as by state officers armed with statute or ordinance.'"

[31] I agree with the Court, for the reasons stated in its opinion, that the relevant custom in this case would be one of segregating the races in dining facilities, rather than one of refusing to serve white persons in the company of Negroes. Of course, I do not agree that the custom must be shown to have been "state enforced."

Of course, a custom or usage is within § 1983 only if it is a custom of a "State or Territory." It was recognized during the debate on the Ku Klux Klan Act that the word "State" does not refer only to state government. In *Texas* v. *White,* 7 Wall. 700, 720–721 (1869),[32] decided just two years before the debate, this Court said of the word "State" as used in the Constitution:

"It describes sometimes a people or community of individuals united more or less closely in political relations, inhabiting temporarily or permanently the same country; often it denotes only the country or territorial region, inhabited by such a community; not unfrequently it is applied to the government under which the people live; at other times it represents the combined idea of people, territory, and government.

"It is not difficult to see that in all these senses the primary conception is that of a people or community. The people, in whatever territory dwelling, either temporarily or permanently, and whether organized under a regular government, or united by looser and less definite relations, constitute the state.

"This is undoubtedly the fundamental idea upon which the republican institutions of our own country are established. . . .

"In the Constitution the term state most frequently expresses the combined idea just noticed, of people, territory, and government. A state, in the ordinary sense of the Constitution, is a political community of free citizens, occupying a territory of defined boundaries, and organized under a

[32] *Texas* v. *White* was overruled on an unrelated issue in *Morgan* v. *United States,* 113 U. S. 476, 496 (1885). Thereafter, it was quoted approvingly on the meaning of "State" in *McPherson* v. *Blacker,* 146 U. S. 1, 25 (1892).

government sanctioned and limited by a written constitution, and established by the consent of the governed."

This language was quoted in the debate. See Cong. Globe, 42d Cong., 1st Sess., App. 80 (remarks of Rep. A. Perry). When the word "State" in § 1983 is so understood, then it is not at all strained or tortured—indeed, it is perfectly natural—to read "custom" as meaning simply "custom" in the enumeration "statute, ordinance, regulation, custom, or usage, of any State." Moreover, I agree with the Court that just as an ordinance can be state action, so, too, can a custom of a subdivision of a State be a custom "of [a] State" for purposes of § 1983; and in my view a custom of the people living in a subdivision is a custom of the subdivision. Thus a person acts under color of a custom or usage of a State when there is among the people of a State or subdivision of a State a widespread and longstanding practice regarded as prescribing norms for conduct and supported by community sentiment or sanctions, and a person acts in accordance with this custom either from a belief that the norms it prescribes authorize or require his conduct or from a belief that the community at large regards it as authorizing or requiring his conduct.[33]

---

[33] It is only superficially odd that a violation of a constitutional right may be actionable under § 1983 if the violation occurs in one State where there is a custom, but not in another State where there is not. In both cases it would be just to impose liability on the violator. However, Congress was interested in providing a remedy only against what I have called "major" violations, and it is for that reason that liability may vary from one State to another. Similarly, privately chosen discrimination will constitute state action in some States, but not in others, depending on the public policies of the different States. That result, too, is dictated by sound considerations of principle and policy, though reflected in the Constitution rather than in a statute.

The Court eschews any attempt to interpret § 1983 against the background of a rational scheme of congressional purposes. Instead it relies basically on three sets of materials to support its restrictive interpretation of the statute. First are cases; some make casual use of the vague phrase "under color of law" as a summation of the "under color" language of § 1983, and the rest interpret the significance of custom either under an erroneous theory of constitutional law or outside the specific context of § 1983 altogether. I have already shown why these cases are hardly relevant, much less controlling, here. See *supra*, at 213–214 and n. 22. The Court's second set of authorities consists of three quotations from the legislative history purporting to explain the scope of § 1983. I have already shown that such quotations cannot be set up as a reliable guide to interpretation. See n. 25, *supra*. Given the demonstrable lack of consensus among the debaters on this precise issue, it is highly misleading to select two or three statements arguably favorable to one view and pronounce them authoritative. Moreover, as I have already indicated, see n. 25, *supra*, the remarks of Representative Shellabarger and Senator Edmunds consist merely of a handy formula for a debate not directed to matters of draftsmanship, and are themselves subject to varying interpretation.

Finally, the Court dwells on the relative lack of controversy over § 1983 in contrast to the heated debate over § 2 of the 1871 Act. However, despite Senator Edmunds' complacent prediction, § 1983 was opposed, and opposed vigorously. Senator Johnston commented, "The Senator from Vermont [Senator Edmunds] said that there would be no objection to the first section of the bill. That section, in my view, has only the slight objection of being unconstitutional." Cong. Globe, 42d Cong., 1st Sess., App. 215. Repre-

sentative McHenry called § 1983 an "outrage," a "flagrant infraction" of the Constitution. *Id.*, at 429. Representative Edward Rice characterized it as bringing "lambs to the slaughter"; it was, he said, "a provision for dragging persons from their homes, from their neighbors, and from the vicinage of the witnesses for the redress of private grievances to the Federal courts." *Id.*, at 395. See also *id.*, at App. 216–217 (remarks of Sen. Thurman).

Moreover, the Court does not adequately characterize the controversy over § 2 of the Act. As originally proposed, § 2 would have made a federal crime of any conspiracy in a State to commit an act that if committed on a federal enclave would constitute "murder, manslaughter, mayhem, robbery, assault and battery, perjury, subornation of perjury, criminal obstruction of legal process or resistance of officers in discharge of official duty, arson, or larceny." See *id.*, at App. 68–69 (remarks of Rep. Shellabarger). Extreme opponents of the bill attacked this section, as they attacked other sections. Moderate opponents objected not because the section reached private conduct but because it ousted the States from a broad range of their criminal jurisdiction even where they were successfully meeting their constitutional obligation to provide equal protection. See, *e. g., id.*, at 366 (remarks of Rep. Arthur, an opponent). Representative Garfield, for example, criticized the original § 2, see *id.*, at App. 153, but praised and voted for the final bill, including § 2, which he understood to reach private conduct, see *id.*, at 807, 808.

On its intrinsic merits, the Court's conclusion that custom "for purposes of § 1983 must have the force of law" would be wholly acceptable if the phrase "force of law" meant, as at common law, merely that custom must have the effect of law—that it be generally regarded as having normative force, whether or not en-

forced or otherwise supported by government. It is clear, however, that this is not the Court's meaning. The Court takes the position that custom can acquire the force of law only "by virtue of the persistent practices of state officials." Little in the debate supports this narrow reading of the statute. The statement by Representative Garfield on which the Court relies, *ante,* at 167, refers not merely to "permanent and well-settled" official practices, but more broadly to "systematic maladministration of [the laws], or a neglect or refusal to enforce" them. In short, under Representative Garfield's theory of the Equal Protection Clause, private customary violations of constitutional rights on the basis of race were denials of equal protection because of the failure of the State to prevent or remedy them. Mere state inaction converted customary private discrimination into a denial of equal protection, which Congress under §§ 1 and 5 had power to remedy. See also Cong. Globe, 42d Cong., 1st Sess., 333–334 (remarks of Rep. Hoar, a moderate supporter); *id.,* at 375 (remarks of Rep. Lowe, a supporter). Our cases have never explicitly held that state inaction alone in the face of purely private discrimination constitutes a denial of equal protection. But cf. *Burton* v. *Wilmington Parking Authority, supra,* at 725; *Catlette* v. *United States,* 132 F. 2d 902, 907 (C. A. 4th Cir. 1943); *Lynch* v. *United States,* 189 F. 2d 476 (C. A. 5th Cir. 1951); Henkin, *Shelley* v. *Kraemer:* Notes for a Revised Opinion, 110 U. Pa. L. Rev. 473 (1962); see also *supra,* at 189. Nevertheless, the constitutional theory of the men who enacted § 1983 remains relevant for our interpretation of its meaning. Representative Garfield's theory of § 1 of the Fourteenth Amendment and of congressional power under §§ 1 and 5 had strong support in the debate. See Harris, *supra,* n. 26. Recognition of that theory—and *a fortiori* of the other principal theory among the bill's supporters, the

radical view that the Fourteenth Amendment empowers Congress to assert plenary jurisdiction over state affairs, see *ibid.*—only provides further confirmation for the conclusion that "custom" in § 1983 means custom of the people of a State, not custom of state officials.

### III

Since this case is being remanded, I think it proper to express my views on the kinds of relief to which petitioner may be entitled if she should prevail on the merits.

Section 1983 in effect authorizes the federal courts to protect rights "secured by the Constitution and laws" by invoking any of the remedies known to the arsenal of the law. Standards governing the granting of relief under § 1983 are to be developed by the federal courts in accordance with the purposes of the statute and as a matter of federal common law. See *Tenney* v. *Brandhove,* 341 U. S. 367 (1951); *Monroe* v. *Pape, supra; Pierson* v. *Ray,* 386 U. S. 547 (1967); *Basista* v. *Weir,* 340 F. 2d 74, 85–87 (C. A. 3d Cir. 1965); cf. *Sullivan* v. *Little Hunting Park,* 396 U. S. 229, 238–240 (1969); *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 433–434 (1964). Of course, where justice requires it, federal district courts are duty-bound to enrich the jurisprudence of § 1983 by looking to the remedies provided by the States wherein they sit. 42 U. S. C. § 1988. But resort to state law as such should be had only in cases where for some reason federal remedial law is not and cannot be made adequate to carry out the purposes of the statute.

Section 1983 does not in general impose strict liability on all who come within its prohibitions; certain broad immunities are recognized. See *Tenney* v. *Brandhove, supra; Monroe* v. *Pape, supra,* at 187–192; *Pierson* v. *Ray, supra,* at 553–555. In some types of cases where the wrong under § 1983 is closely analogous to a wrong

recognized in the law of torts, it is appropriate for the federal court to apply the relevant tort doctrines as to the bearing of particular mental elements on the existence and amount of liability. See, *e. g., Pierson* v. *Ray, supra; Whirl* v. *Kern,* 407 F. 2d 781 (C. A. 5th Cir. 1969). In other types of cases, however, the common law of torts may be divided on important questions of defenses and relief, or it may be inadequate to carry out the purposes of the statute. Thus the common law is not an infallible guide for the development of § 1983. In particular, denial of equal protection on the basis of race was the central evil that § 1983 was designed to stamp out. Where that is the basis for recovery, relief should not depend on the vagaries of the general common law but should be governed by uniform and effective federal standards.

The appropriateness of any particular remedy in a given case depends on the circumstances of that case, and especially on the degree of culpability of the defendant. In my view, where a plaintiff shows a voluntary denial of equal protection on the ground of race amounting to a violation of § 1983 he is entitled to recover compensation for actual damages, if any, simply on the basis of the proved violation. The question of compensatory damages is one of allocation of actual loss, and, as between the innocent plaintiff and the defendant who deliberately discriminates on the basis of race, I think it just and faithful to the statutory purposes to impose the loss on the discriminator, even if he was unaware that his discrimination constituted state action denying equal protection. Proof of an evil motive or of a specific intent to deprive a person of a constitutional right is generally not required under § 1983. *Monroe* v. *Pape, supra,* at 183–187; *Whirl* v. *Kern, supra.* And, indeed, in *Nixon* v. *Herndon,* 273 U. S. 536 (1927), and *Lane* v. *Wilson,* 307 U. S. 268 (1939), this Court upheld complaints seek-

ing $5,000 recoveries from state election officials who merely carried out their official duty to prevent the plaintiffs from voting under discriminatory state statutes which made them ineligible to vote. Of course, there may be cases where it would be proper to give declaratory or injunctive relief without damages. See *Williams* v. *Hot Shoppes, Inc.,* 110 U. S. App. D. C. 358, 370, 293 F. 2d 835, 847 (1961) (Bazelon, J., dissenting).

To recover punitive damages, I believe a plaintiff must show more than a bare violation of § 1983. On the other hand, he need not show that the defendant specifically intended to deprive him of a recognized federal right, as is required by the word "willfully" in 18 U. S. C. § 242, see *Screws* v. *United States, supra.* Nor need he show actual damages. *Basista* v. *Weir, supra,* at 87–88; *Tracy* v. *Robbins,* 40 F. R. D. 108, 113 (D. C. S. C. 1966). It is sufficient for the plaintiff to show either that the defendant acted "under color of [a] statute, ordinance, regulation, custom, or usage of any State or Territory," with actual knowledge that he was violating a right "secured by the Constitution and laws," *or* that the defendant acted with reckless disregard of whether he was thus violating such a right. Cf. C. McCormick, Handbook on the Law of Damages § 79 (1935). However, in my view, a proprietor of a place of public accommodation who discriminates on the basis of race after our decision in *Peterson* v. *City of Greenville, supra,* and the enactment of the Civil Rights Act of 1964, 42 U. S. C. §§ 2000a to 2000h–6, does so with reckless disregard as a matter of law, and therefore may be found liable for punitive damages.[34] Of course, it is proper for the factfinder to consider the degree of recklessness or actual knowledge and other circumstances in assessing the amount of punitive damages to award in a particular case.

---

[34] Moreover, there was evidence below that respondent's attention was expressly called to the Civil Rights Act.

It may be argued that it is inequitable to impose punitive damages on a defendant, a restaurateur for example, who knowingly or recklessly violates a constitutional right and § 1983 out of fear that he will lose some of his customers if he does not. That argument is plainly unacceptable. The protection of constitutional rights may not be watered down because some members of the public actively oppose the exercise of constitutional rights by others. *Cooper* v. *Aaron,* 358 U. S. 1 (1958). To give any weight at all to that argument would be to encourage popular opposition to compliance with the Constitution. Moreover, the argument is particularly devoid of merit in the context of § 1983, which was enacted by a Congress determined to stamp out widespread violations of constitutional rights at virtually any cost, and which imposed liability even on persons who simply failed to prevent certain violations. See Cong. Globe, 41st Cong., 1st Sess., 804 (remarks of Rep. Poland). If § 1983 is given an interpretation befitting its purposes, the threat of withdrawal of patronage will be largely empty since no other place of public accommodation in the community will be in a better position to discriminate. The prospect of substantial punitive damages may be the most effective means to persuade all proprietors of places of public accommodation to respect constitutional rights.